(f) copies of reports made to regulatory agencies;

(g) twenty-four (24) hour notice by telephone to the designated representative listed in Exhibit "A" (or the designated alternate), of logging, coring and testing operations; and,

(h) upon written request, samples of cuttings and cores marked as to depth, to be packaged and shipped at the expense of the requesting Party.

5.10 Information to Non-Participating Parties. Operator shall furnish to each Non-Participating Party copies of all non-confidential reports (or non-confidential portions thereof) made to regulatory agencies. A Non-Participating Party shall be entitled to receive the information specified in Section 5.9 after the recoupment provisions in Section 10.4 and/or Section 12.2.1 have been satisfied.

ARTICLE 6.

VOTING AND VOTING PROCEDURES

6.1 Designation of Representatives. The names and addresses of the representative and alternate, who are authorized to represent each Party with respect to operations hereunder, are set forth in Exhibit "A". The designated representative or alternate may be changed by written notice to the other Parties.

6.2 Voting Procedures. Unless otherwise provided, any matter requiring approval of the Parties, except an amendment to this Agreement, shall be determined as follows:

6.2.1 Voting Interest. Each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

6.2.2 Vote Required. Proposals requiring approval of the Parties shall be decided by an affirmative vote of one (1) or more Parties having a combined voting interest of fifty percent (50%) or more.

6.2.3 Votes. The Parties may vote at meetings; or by telephone, promptly confirmed in writing to Operator; or by letter, telegram, telex, or telecopy (facsimile).

6.2.4 Meetings. Meetings of the Parties may be called by Operator upon its own motion or at the request of any Party(ies) having a combined voting interest of not less than twenty-five percent (25%). Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than seven (7) days advance written notice. Notice of such meeting shall include the agenda of matters to be considered. The representative of Operator shall be chairman of each meeting. Only matters provided for in the agenda of the meeting shall be decided and acted upon at a meeting; provided, however, that by unanimous agreement of the Parties present at such meeting, the agenda and items included therein may be amended.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 7

ACCESS

7.1 Access to Lease. Each Party shall have access to the Lease at its sole risk and expense at all reasonable times to inspect joint operations, wells, Platforms, Facilities or Subsequent Facilities in which it participates, and records and data pertaining thereto.

7.2 Reports. Upon written request, Operator shall furnish to a requesting Party information not otherwise furnished under Article 5 to which such Party is otherwise entitled hereunder and may charge all costs and expenses therefor to the Party making the request.

7.3 Confidentiality. For the purposes of this Agreement, the term "Confidential Information" shall mean any geological, geophysical, engineering, technical, production test, exploratory, or reservoir information, or any logs or other information pertaining to any well drilled pursuant to this Agreement to the extent that such information was acquired at joint expense and title to all rights in such information has been granted to the Operator by the relevant contractor acquiring such information. Except as provided in Section 7.5, no Party shall during the term of this Agreement and for a period of three (3) years thereafter, trade, sell, publish or release any such Confidential Information without the agreement of all Participating Parties. Otherwise, the Parties shall jointly own all such Confidential Information without duty to account. Each Party's obligation to protect Confidential Information shall be considered met by each Party using at least the same degree of care as it uses in protecting its own proprietary materials of like kind.

7.4 Exceptions. No Party shall have any obligation to limit disclosure or use any portion of Confidential Information which:

(a) is already in that Party's possession prior to receipt hereunder;

(b) is now in or hereafter becomes publicly available through no fault of that Party;

(c) is disclosed to that Party without obligation of confidence by a third party which has the right to make such disclosure; or;

(d) is independently developed by or for such Party without reference to information received under this Agreement.

7.5 Limited Disclosure. Notwithstanding any other provision of this Agreement, the Parties may make Confidential Information available to third parties as follows:

(a) A Party may provide the Confidential Information to a consultant or engineering firm for hydrocarbon reserve or other technical evaluation, analysis or interpretation or for reprocessing for the Party, provided that such consultant or engineering firm is not allowed to retain a copy of the Confidential Information after completion of its services and agrees in writing to treat it as confidential.

(b) A Party may show the Confidential Information to, but not provide copies thereto, a third party: (1) with which the Party hereto is negotiating sale of its interest, or part thereof, under this Operating Agreement and/or its

Unofficial Copy Office of Chris Daniel District Clerk

Working Interest in the Leases(s); or (2) with which the Party hereto is negotiating a possible merger or consolidation or sale of its business operations which include this Operating Agreement or the related Lease(s); provided that such third party or parties agree in writing to hold all such Confidential Information in confidence. In the event of completion of a transaction contemplated by this paragraph, a copy of all Confidential Information may be provided to the successor in interest of the Participating Party and the original Party may also retain copies of the Confidential Information with all the rights and obligations which it had prior to the completion of the transaction.

(c) A Party may show the Confidential Information to, but not provide copies thereof to, any third party or parties with which it is negotiating an agreement relating to the development, including transportation or sale, of minerals in, on or under any region which is geologically related to the area on which the Confidential Information was taken including farmout agreements, joint exploration, development, production, gas pipeline, and financing agreements including joint ventures; provided that such third parties agree in writing to hold such Confidential Information in confidence, and the Party showing the Confidential Information notifies the other Party of when and to whom such information was disclosed.

(d) A Party may show and provide copies of the Confidential Information to an Affiliate provided that such Affiliate agrees in writing to be bound by the confidentiality provisions of this Agreement.

(e) Each Party may show the Confidential Information to and provide copies thereof to agencies of federal and state governments having jurisdiction to the extent required by applicable law, rule or regulation, provided that the disclosing Party shall promptly advise the other Parties of each request, demand, order, etc. for the information, to whom disclosure is to be made, and the law, rule or regulation requiring disclosure and shall take all reasonable actions, and assist in taking all reasonable actions, as permitted by such laws, rules and regulations, to object to such disclosure and to require the confidential treatment of the Confidential Information which must be disclosed.

(f) Confidential Information which relates to the existence of the transaction, its proposed structure and other matters of a general nature as may be discussed by a Party with nationally recognized statistical ratings agencies consistent with the Party's and industry practice.

7.6 Proceeds. During the term of this Agreement, the Parties agree that any proceeds obtained from the sale of Confidential Information shall be shared by the Parties in proportion to their share of the total costs and expenses to acquire same.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 8

EXPENDITURES

8.1 Basis of Charge to the Parties. Except as otherwise provided in this Agreement, Operator shall pay all costs incurred and each Party shall reimburse Operator in proportion to its Participating Interest. All charges, credits and accounting for expenditures shall be pursuant to Exhibit "C". The provisions of this Agreement shall prevail in the event of conflict with Exhibit "C".

8.2 Authorization. Prior to undertaking any project or making any single expenditure related to the Contract Area in excess of One Hundred Thousand Dollars ($100,000.00), Operator shall submit for the approval of the Parties an Authority for Commitment ("AFE") for such project or expenditure. Operator shall furnish written information to all the Parties on any project or single expenditure costing less than One Hundred Thousand Dollars ($100,000.00) but in excess of Fifty Thousand Dollars ($50,000.00) if Operator prepares same for its own use. Notwithstanding the One Hundred Thousand Dollar ($100,000.00) limitation, where such project or expenditure involves changing zones in a well or a workover operation, an AFE shall be submitted to the Parties for approval. Approval of a Development Well or an Exploratory Well operation shall include approval of all necessary expenditures through drilling, coring and logging to the objective depth and plugging and abandoning costs, if applicable. In the event of an emergency, Operator may immediately make such expenditures as in its opinion are required to deal with the emergency. Operator shall report to the Parties, as promptly as possible, the nature of the emergency and action taken. The Operator shall provide supplemental AFE's to Participating Parties, for informational purposes only, if it reasonably determines that the expected actual costs of an operation will exceed the amount of the approved AFE by 15% or more, but only if the dollar amount of such expected excess is greater than Two Hundred Fifty Thousand Dollars ($250,000.00).

8.3 Cost Overruns. If during the drilling or completion of an Exploratory Well(s) or Development Well(s) Operator reasonably determines that the actual costs will exceed the latest approved AFE for the well by fifty percent (50%), Operator shall submit a supplemental AFE to the Participating Parties to make an election as to their further participation in such operations. Such election shall be effective as of the date received by Operator, and any Participating Party which becomes a Non-Participating Party as to such further operation under this Article shall be subject to the provisions of Article 12 (Non-Consent Operations) only for the amount of the actual supplemental costs incurred.

8.4 Advance Billings. Operator shall have the right to require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C". Notwithstanding anything to the contrary contained herein, a Party shall be deemed to have non-consented any proposed operation if the operator makes a cash call upon approval of an operation and a participating Party does not advance their share of the estimated cash outlay for the approved operation within thirty (30) days after receipt of the cash call. It is not the intent of the Parties to unjustly force a willing participant to go non-consent in an operation by virtue of a clerical error or oversight.

Unofficial Copy Office of Chris Daniel District Clerk

Therefore, in the event a Party elects to participate in an operation and said Party's payment is not received within thirty (30) days after the cash call, said Party shall not be deemed to have gone non-consent in the event payment is received within 48 hours, excluding weekends and holidays, after being notified that said thirty (30) day period has ended without receipt of payment.

8.5 Commingling of Funds. Funds received by Operator under this Agreement may be commingled with its own funds.

8.6 Security Rights - Properties Located Offshore Adjacent to the State of Louisiana. In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the following security rights:

(a) First Lien in Favor of the Operator. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, each Non-Operator, to secure the performance of and payment by such Non-Operator to the Operator of all obligations and indebtedness, whether now owed or hereafter arising, of such Non-Operator to the Operator pursuant to this Agreement, grants to the Operator a lien upon the following described property:

(i) all of its rights, titles, and interests, including, without limitation, any Working Interest, whether now owned and existing or hereafter acquired or arising, in and to (1) the Lease, subject to any surface acreage or depth limitations set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, (2) all fixtures on or used or obtained for use in connection with the Lease or the Contract Area, and (3) all other real property susceptible of the lien granted hereby located within the Contract Area;

(ii) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any rights-of-way or other documents described in Exhibit "A" and all renewals and extensions thereof and all new oil, gas and mineral leases, rights-of-way, or other documents (i) in which it acquires an interest after the termination or expiration of any Lease, right-of-way, or other document described in Exhibit "A", and (ii) that cover all or any part of the property described in and covered by such terminated or expired Lease, right-of-way, or other document, to the extent, and only to the extent, such new oil, gas and mineral leases, rights-of-way, or other documents may cover the property that was described in and covered by such terminated or expired Lease, right-of-way or other document; and

(iii) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any of the oil, gas, and minerals in, on, or under the Contract Area, including, without limitation, all contractual rights, operating rights, leasehold interests, working interests, royalty interests, overriding royalty interests, non-participating royalty interests, mineral interests, production payments, net profits interests, or any other interest measured by or payable out of production of oil, gas, or other minerals from the Lease or production attributable to the Contract Area (as such

Unofficial Copy Office of Chris Daniel District Clerk

interests may be enlarged by the discharge of any payments out of production or by the removal of any charges or encumbrances). Excluded from this provision shall be the ORI's set forth in Exhibit "A" to that certain Participating Agreement dated October 1, 1999, by and between PetroQuest and LLOG Exploration & Production Company.

(b) Security Interest in Favor of the Operator. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, each Non-Operator, to secure the performance of and payment by such Non-Operator to the Operator of all obligations and indebtedness, whether now owed or hereafter arising, of such Non-Operator to the Operator pursuant to this Agreement, grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired or arising, in and to (a) all oil, gas, and other minerals produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced; (b) all accounts receivable accruing or arising as a result of the sale of such oil, gas, and other minerals (including, without limitation, accounts arising from gas imbalances or from the sale of oil, gas and other minerals at the wellhead); (c) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (d) all platforms, wells, facilities, fixtures, tools, tubular goods, other personal property, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used or obtained for use in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area, and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof, excluding, however, any platforms, wells, facilities, fixtures, equipment or property located on the Lease or the Contract Area and used exclusively in connection with the ownership, use or exploitation of acreage or depths not included within the Lease or Contract Area. The interest of the Non-Operators in and to the oil, gas, and other minerals produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent permissible under applicable law, the security interest granted by each Non-Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Non-Operator described herein and is intended to cover all of the rights, titles and interests of such Non-Operator in all personal property now or hereafter located upon or used in connection with the Contract Area, whether tangible or intangible, except for property used exclusively in connection with acreage or depths not included in the Lease or Contract Area as aforesaid; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operator in connection with the Lease or the Contract Area, or the oil, gas and

Unofficial Copy Office of Chris Daniel District Clerk

other minerals produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise to the extent that it holds, owns, or controls any interest in the Contract Area; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include and are attributable to all or any portion of the Lease or the Contract Area. Excluded from this provision shall be the ORI's set forth in Exhibit "A" to that certain Participating Agreement dated October 1, 1999, by and between PetroQuest and LLOG Exploration & Production Company.

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

c) Obligations and Indebtedness of Non-Operators Secured. To the extent permissible under applicable law, the liens and security interests granted by each Non-Operator in this Agreement shall secure (a) the performance of and payment by such Non-Operator to the Operator of all of its obligations and indebtedness, whether now owed or hereafter arising pursuant to this Agreement, and (b) the payment of all expenses incurred



Unofficial Copy Office of Chris Daniel District Clerk

by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement ("Costs") and other expenses properly charged to such Non-Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs. If any Non-Operator does not pay such Costs and other expenses when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operator's production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operator's share of production.

(d) First Lien in Favor of the Non-Operators. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, to secure the performance of and payment by the Operator to each of the Non-Operators of all obligations and indebtedness, whether now owed or hereafter arising, of the Operator to such Non-Operators pursuant to this Agreement, the Operator grants to each such Non-Operator a lien upon the following described property:

(i) all of its rights, titles, and interests, including, without limitation, any Working Interest, whether now owned and existing or hereafter acquired or arising, in and to (1) the Lease, subject to any surface acreage or depth limitations set forth in Exhibit "A" attached hereto and incorporated herein for all purposes, (2) all fixtures on or used or obtained for use in connection with the Lease or the Contract Area, and (3) all other real property susceptible of the lien granted hereby located within the Contract Area;

(ii) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any rights-of-way or other documents described in Exhibit "A" and all renewals and extensions thereof and all new oil, gas and mineral leases, rights-of-way, or other documents (1) in which it acquires an interest after the termination or expiration of any Lease, right-of-way, or other document described in Exhibit "A", and (2) that cover all or any part of the property described in and covered by such terminated or expired Lease, right-of-way, or other document, to the extent, and only to the extent, such new oil, gas and mineral leases, rights-of-way, or other documents may cover the property that was described in and covered by such terminated or expired Lease, right-of-way or other document; and

(iii) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any of the oil, gas, and minerals in, on, or under the Contract Area, including, without limitation, all contractual rights, operating rights, leasehold interests, working interests, royalty interests, overriding royalty interests, non-participating royalty interests, mineral interests, production payments, net profits

Unofficial Copy Office of Chris Daniel District Clerk

interests, or any other interest measured by or payable out of production of oil, gas, or other minerals from the Lease or production attributable to the Contract Area (as such interests may be enlarged by the discharge of any payments out of production or by the removal of any charges or encumbrances). Excluded from this provision shall be the ORI's set forth in Exhibit "A" to that certain Participating Agreement dated October 1, 1999 by and between PetroQuest and LLOG Exploration & Production Company.

(e) Security Interest in Favor of the Non-Operators. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, to secure the performance of and payment by the Operator to each of the Non-Operators of all obligations and indebtedness, whether now owed or hereafter arising, of the Operator to such Non-Operators pursuant to this Agreement, the Operator grants to each of the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired or arising, in and to (a) all oil, gas, and other minerals produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced; (b) all accounts receivable accruing or arising as a result of the sale of such oil, gas, and other minerals (including, without limitation, accounts arising from gas imbalances or from the sale of oil, gas and other minerals at the wellhead); (c) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (d) all platforms, wells, facilities, fixtures, tools, tubular goods, other personal property, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used or obtained for use in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area, and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof, excluding, however, any platforms, wells, facilities, fixtures, equipment or property located on the Lease or the Contract Area and used exclusively in connection with the ownership, use or exploitation of acreage or depths not included within the Lease or Contract Area. The interest of the Operator in and to the oil, gas, and other minerals produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all personal property now or hereafter located upon or used in connection with the Contract Area, whether tangible or intangible, except for property used exclusively in connection with acreage or depths not included in the Lease or Contract

Unofficial Copy Office of Chris Daniel District Clerk

Area as aforesaid; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Lease or the Contract Area, or the oil, gas and other minerals produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise to the extent that it holds, owns, or controls any interest in the Contract Area; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired or arising, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include and are attributable to all or any portion of the Lease or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

(f) Obligations and Indebtedness of the Operator Secured. To the extent permissible under applicable law, the liens and security interests granted by the Operator in this Agreement shall secure (a) the performance of and payment by the Operator to each of the Non-Operators of all of its obligations and indebtedness, whether now owed or hereafter arising pursuant to this Agreement, and (b) the payment of all Costs and other expenses properly charged to the Operator, together with (1) interest on such

Unofficial Copy Office of Chris Daniel District Clerk

indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs. If the Operator does not pay such Costs and other expenses when due, each Non-Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Operator's production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Operator's share of production until the amount owed has been paid. The Non-Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Operator's share of production.

(g) Priority Successors. Each Party represents and warrants to the other Parties hereto that the lien and security interest granted by such Party to the other Parties shall be a first and prior lien and security interest, and each Party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in the Lease or the Contract Area by, through or under such Party. All Parties acquiring an interest in the Lease or the Contract Area, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest hereunder as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

(h) Waiver. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of this Agreement, to the extent allowed by governing law, the defaulting Party waives any available right of redemption from and after the date of judgment, and any available right to require a marshaling of assets.

(i) Other Lien Rights. Each Party agrees that the other Parties shall be entitled to utilize the provisions of oil and gas lien law or other lien law of any state adjacent to the Contract Area, or that is otherwise applicable, to enforce the obligations and indebtedness of each Party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, each of the Non-Operators agree that the Operator may invoke or utilize the mechanics' or materialmen's lien law of the state adjacent to the Contract Area, or that is otherwise applicable, in order to secure the payment to the Operator of any sum due hereunder for services performed or materials supplied by the Operator.

(j) Power of Sale. To the extent permitted by applicable law, each Party hereby grants to the other parties a power of sale ("Power of Sale") as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by this clause (x) and in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice, including reasonable notice of intent to foreclose said lien or security rights by exercise of such Power of Sale of not less than thirty (30) days. Subject to the provisions of this Section 8.5.a, if a Party should elect to foreclose the lien (the "Lien") granted to such party (the

Unofficial Copy Office of Chris Daniel District Clerk

"Foreclosing Party") pursuant to this Section 8.5.a against the interests in the leasehold estate of the Lease or any future leases comprising the Contract Area ("Real Property Interest") of a Party that has failed to pay any liquidated and undisputed portion of its payment obligations hereunder (the "Defaulting Party"), the Parties hereby authorize a non-judicial sale under the laws of the State of Louisiana is hereby appointed as Trustee for such purpose (whether the Trustee named herein or appointed as a substitute or successor Trustee pursuant to the terms of this Agreement, the "Trustee"). The Foreclosing Party may appoint a substitute or successor Trustee in the event the Trustee above named resigns or is unable for any reason to serve, or if the Foreclosing Party should elect at any time (with or without cause) to remove the Trustee. Upon such default, and upon request by the Foreclosing Party to the Trustee to foreclose the Lien pursuant to this Power of Sale, the Trustee shall, at least twenty one (21) days preceding the date of non-judicial sale, serve written notice of the proposed sale by certified mail on the Defaulting Party according to the records of the Foreclosing Party. Service of such notice shall be deemed completed upon the deposit in a post office or other official depository under the care and custody of the United States Postal Service of such notice enclosed in a post-paid wrapper properly addressed to the Defaulting Party, together with each other Party obligated to pay the obligations secured by the Lien, at the most recent address or addresses shown on the records of the Foreclosing Party. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the facts of service. After such notice, the Trustee shall proceed to sell all of the Real Property Interest of the Defaulting Party in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as required by the statutes of the State of Louisiana in making sales of real estate under deeds of trust. Sale of a part of the Defaulting Party's Real Property Interest in the Contract Area shall not exhaust the Power of Sale, and subsequent sales may be made from time to time until all of such Real Property Interest is sold or the obligations of the Defaulting Party secured by the Lien are paid in full. The Trustee shall have the authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers. It is further agreed that the Trustee may sell the full Real Property Interest of the Defaulting Party in the Contract Area or may limit such sale to such portions of the Real Property Interest of the Defaulting Party in the Contract Area as the Trustee shall deem expedient. After the completion of any sale pursuant hereto, the Trustee shall make, execute, and deliver to the purchaser or purchasers of the Real Property Interest of the Defaulting Party in the Contract Area good and sufficient deeds, assignments, or other lawful conveyances to vest in such purchaser or purchasers title to such Real Property Interest in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto on or

Unofficial Copy Office of Chris Daniel District Clerk

subsequent to the effective date of such sale. From the proceeds of such sale, the Trustee shall make disbursements in the following order:

(a) pay all charges, costs, and expenses of executing these provisions;

(b) pay any sums due and paid by the Trustee for taxes in the preservation of the security;

(c) pay to the Foreclosing Party up to the amount necessary to satisfy the Defaulting Party's obligations and indebtedness hereunder; and

(d) the balance, if any, shall be paid to the Defaulting Party.

It is agreed that such sale shall be a perpetual bar against the Defaulting Party and its heirs, successors, assigns, legal representatives, and all other persons claiming under him, them, or any of them. It is further agreed that the Trustee, or any holder or holders of the obligation of the Defaulting Party, or the Foreclosing Party shall have the right to become the purchaser or purchasers at such sale if such Party is the highest bidder or bidders, in which event the bid or bids may be credited upon the indebtedness of the Defaulting Party. It is stipulated and agreed that, in case of any sale hereunder by Trustee or its successor, all prerequisites of such sale shall be presumed to have been performed; and any conveyance given hereunder and all statements of fact or recitals therein made as to (a) the nonpayment of money secured, (b) any default under the terms hereof, (c) the request by the Foreclosing Party to the Trustee to foreclose the Lien, (d) the proper and due appointment of any successor or substitute Trustee, (e) the advertisement of sale, (f) the time, place, and terms of sale, or (g) any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. If the Foreclosing Party consists of more than one Party, actions and directions of the Foreclosing Party under this clause (x) Power of Sale shall require the approval of the holders of a majority in amount of the Defaulting Party's liquidated and undisputed payment obligations which are then due.

(k) Recordation. To provide evidence of and to protect the Parties' security rights created hereunder, upon request of the Operator or any other Party, each Party shall execute (a) a financing statement, as debtor (on a standard UCC form which shall be provided by the Operator) evidencing the security interest created by such Party in this section, and (b) a memorandum of this Agreement to be filed in the public records set forth below in the form attached as Exhibit "G" (the "Memorandum of Operating Agreement and Financing Statement evidencing the security rights created by the Parties. The Parties authorize the Operator (or any other Party should Operator fail to act following written request) to file all such financing statements with the appropriate governmental agencies to perfect such security interests under applicable state law and to file the Memorandum of Operating Agreement and Financing Statement to serve as notice of the existence of this Agreement as a burden on the title of the Operator and the Non-Operators to their interests in the Lease and the Contract Area.

Unofficial Copy Office of Chris Daniel District Clerk

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the applicable real estate records of the county or counties adjacent to the offshore blocks contained within the Contract Area, (b) the mortgage records or lien records or other appropriate records of such county or counties, and (c) the appropriate Uniform Commercial Code records of such county or counties and the Secretary of State of Louisiana.

8.7 Default. If any Party does not pay its share of the Costs, other expenses, or advances authorized under this Agreement when due, then upon request by any non-defaulting Party, the Operator will give the defaulting Party notice that unless payment is made within fifteen (15) days from delivery of the notice, the non-paying Party shall be in default. A defaulting Party shall be subject, in addition to those remedies provided in Section 8.6 above or elsewhere in this Agreement, to one or more of the remedies specified below. A Party in default shall have no further access to the rig, any Confidential Information or other maps, records, data, interpretations, or other information obtained in connection with operations hereunder, nor shall a defaulting Party be allowed to participate in meetings. A Party in default shall not be entitled to vote on any matter or to elect to participate in any new operation until such time as the defaulting Party is no longer in default. The defaulting Party may be required to advance payment on any anticipated share of expense for the succeeding month, which would otherwise be subject to reimbursement, whether or not such expense was the subject of the previous default. Failure to make such advance shall be a default and shall subject the defaulting Party to any remedy provided in this Agreement. The voting interest of each non-defaulting Party shall be counted in the proportion its Participating Interest bears to the total non-defaulting Participating Interests. As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party. If a Party protests to the Operator in writing that all or a portion of any payment of such Party is not being made as a result of a good faith dispute over the Costs and other expenses or advances owed by such Party under this Agreement, the protesting Party shall not be considered in default as to the disputed amount. The protest of a portion of a payment shall not relieve the protesting Party from promptly paying any undisputed portion of such Costs or other expenses or advances.

8.8 Unpaid Charges. If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within sixty (60) days after receipt of the Operator's statement in accordance with this Agreement, the Operator, without any demand or other notice whatsoever (except as provided in Section 8.6), may take immediate steps to diligently pursue collection (at joint account expense) of the unpaid Costs and other expenses owed by such Participating Party, and to exercise the Operator's security rights granted by this Agreement. The bringing of a suit and the obtaining of a judgment by the Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein. In addition to any other remedy afforded by law, the Operator shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in the manner provided by law, to exercise the

Unofficial Copy Office of Chris Daniel District Clerk

Power of Sale provided for herein, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state adjacent to the Contract Area or such other states as the Operator shall deem appropriate. The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and costs) and any amounts collected with respect to amounts owed by the nonperforming Party. If any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, and Operator has notified each other Participating Party of such delinquency within sixty (60) days of the occurrence thereof, each other Participating Party shall, upon the Operator's notice and request, pay the unpaid amount of Costs in the proportion that its Participating Interest bears to the total non-defaulting Participating Interests. Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's lien, pledge, mortgage and security rights to the extent of the payment made by such Participating Party.

8.9 Carved-out Interests. Any future agreement creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other similar interest carved out of a Working Interest in the Lease shall specifically make such interests inferior to the rights of the Parties to this Agreement. Excluded from this provision shall be the ORI's set forth in Exhibit "A" to that certain Participating Agreement dated October 1, 1999, by and between PetroQuest and LLOG Exploration & Production Company.

If any Party whose Participating Interest is encumbered with such a "carved-out interest" is in default or otherwise in nonperformance and has not paid its share of the Costs and other expenses authorized under this Agreement, and the proceeds from the sale of its production pursuant to Section 8.6 hereof are insufficient to pay such Costs and expenses, the security rights provided for in Section 8.6 hereof may be applied against the carved out interests with which the defaulting or nonperforming Working Interest is burdened. Excluded from this provision is the ORI interest set forth in Section 8.9 above. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by Section 8.6.

## ARTICLE 9
## NOTICES

9.1 Giving and Responding to Notices. All notices and responses thereto shall be in writing and delivered in person or by telephone followed by United States mail, telex, telegraph, telecopier (facsimile) or cable; however, if a drilling rig is on location and standby charges are accumulating, such notices and responses shall be given by telephone and immediately confirmed in writing. Notices and responses shall be deemed given only when received by the Party to whom such notice or response is directed, except that any notice or response by certified United States mail or equivalent, telegraph, or cable properly addressed, pursuant to Section 6.1, and with all postage and charges prepaid shall be deemed given seventy-two (72) hours after such notice is deposited in the mail exclusive of Saturdays, Sundays, and federal holidays, or twenty-

Unofficial Copy Office of Chris Daniel District Clerk

four (24) hours after such notice or response is sent by telecopier (facsimile), receipt confirmed, or filed with an operating telegraph or cable company for immediate transmission exclusive of Saturdays, Sundays, and federal holidays.

9.2 Content of Notice. Any notice which requires a response shall indicate the response time specified in Section 9.3. If a proposal involves a Platform, Facility or Subsequent Facility, the notice shall contain a description of same, including location and the estimated costs of design fabrication, transportation and installation. If a proposal involves an Exploratory Operation or a Development Operation, the notice shall include the proposed depth, the objective zone or zones to be tested, the surface and bottom-hole locations, applicable details regarding directional drilling, the equipment to be used, and the estimated costs of the operation including all necessary expenditures through installation of the wellhead or abandonment of the well.9.3

Response to Notices. Each Party's response to a proposal shall be in writing to all other Parties. Unless otherwise specified herein, response times shall be as follows:

9.3.1 Platform Construction. When any proposal for well operations involves the construction of a Platform, each Party shall respond within ninety (90) days after receipt of notice.

9.3.2 Proposal Without Platform. When any proposal for well operations does not require construction of a Platform, each Party shall respond within thirty (30) days after receipt of notice. However, if a drilling rig is on location as a result of a joint Exploratory or Development Operation previously conducted thereon and standby charges are accumulating, the response shall be made within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of notice.

9.3.3 Other Matters. For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

9.4 Failure to Respond. Failure of any Party to respond to a notice within the required period shall be deemed to be a negative response.

9.5 Restrictions on Multiple Well Proposals. Notwithstanding any provision herein to the contrary, it is specifically provided that no notice shall be given under this Article 9 hereof which simultaneously proposes the drilling of more that two (2) wells, or proposes the drilling of more than one (1) more well while there is an outstanding proposal. Further, these provisions of this Article 9, insofar as they pertain to notification by a Party of its desire to drill a well, shall be suspended for so long as: (1) a prior notice has been given which is still in force and effect and the period of time during which the well regarding same may be commenced has not expired; or (2) a well is presently drilling hereunder. This section shall not apply under those circumstances where the well to which notice is directed is a well which is required under the terms of the Lease or one required to maintain a portion thereof in force. In the event drilling operations are necessary to perpetuate the Lease, any Party may propose and commence the drilling of such additional well(s) pursuant to the terms and conditions hereof no earlier than one hundred eighty (180) days prior to the date operations must be commenced, regardless of other proposals then under consideration or drilling operations then in progress.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 10

EXPLORATORY OPERATIONS

10.1 Operations by All Parties. Any Party may propose an Exploratory Well by notifying the other Parties. If all the Parties agree to participate in drilling the proposed well, Operator shall drill same at their cost and risk. If a mobile drilling rig is not already on location as a result of a prior Exploratory or Development Operation and the proposal ("Original Proposal") has not already been approved, then any Party may submit an alternate well proposal for consideration within ten (10) days after receiving the Original Proposal to drill a well. If one or more alternate proposals have been submitted in accordance with the foregoing, then the Operator shall call a meeting of the Parties to be held within seven (7) days following receipt of the alternate proposal(s), at which the Parties shall determine by majority vote in interest which proposal shall be considered by the Joint Account. In the event that no proposal receives support of a majority in interest, then the proposal receiving the greatest support shall prevail. In the event of a tie between two or more proposals, then the proposal (including the Original Proposal) supported by the largest number of Parties shall prevail. Each Party having the right to participate in the proposal so selected shall make its election whether to join in the drilling of such well within fifteen (15) days after the meeting was held. If drilling of such well is not commenced within one hundred twenty (120) days after the last applicable election date, the effect shall be the same as if the proposal had not been made; however, the one hundred twenty (120) day period shall automatically be extended for an additional period, not to exceed sixty (60) days, as may be necessary, in order to obtain all applicable required regulatory permits, so long as applications for such required permits were properly filed within thirty (30) days after the last applicable election date. Drilling operations shall be deemed to have commenced on the date rig charges begin according to the terms of the drilling contract.

10.2 Second Opportunity to Participate. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more elect to participate, the Operator shall inform the Parties of the elections made, whereupon any Party originally electing not to participate may then elect to participate by notifying the Operator within forty-eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of such information. This provision shall apply only in the event that there are three (3) or more Parties to this Agreement.

10.3 Final Election to Participate. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more approve any proposed operation, the Operator, immediately after the expiration of the applicable response time, shall inform the Parties who have elected to participate of the total interest of the Parties approving such operation. Each Participating Party, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt of such notice, shall advise the Operator of its desire to (a) limit participation to such Party's working interest as shown on the proposed AFE; or (b) carry its proportionate part of Non-Participating Parties' interests. Failure to advise the

Unofficial Copy Office of Chris Daniel District Clerk

proposing Party shall be deemed an election under (a), notwithstanding Section 9.4. Should any Party elect to limit its participation to its interest as shown on the proposed AFE, the remaining Participating Parties shall carry the Non-Participating Parties' interests in such proportions as the remaining Participating Parties agree to by mutual consent. In the event a drilling rig is on location, the time permitted for any response under this Article 10 shall not exceed a total of forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays. This provision shall apply only in the event that there are three (3) or more Parties to this Agreement.

10.4 Operations by Fewer Than All Parties. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more elect to participate in and agree to bear all of the cost and risk of drilling the proposed well, Operator shall drill such well under this Agreement and the applicable provisions of Article 12 and the following special provisions shall apply:

(a) If the well will be the first Exploratory Well drilled under this Agreement, then as of the last applicable election date, each Non-Participating Party shall be deemed to have relinquished to the Participating Parties, in proportion to their Participating Interests or in the proportions otherwise agreed by the Participating Parties, all of its interest in the Contract Area. If such well is commenced within the time provided in Section 10.1 and is drilled as proposed in accordance with this Agreement, each Non-Participating Party shall execute an assignment of all of its interest in the Contract Area to the Participating Parties, in proportion to their Participating Interests or in the proportions otherwise agreed by the Participating Parties.

(b) If the well will not be the first Exploratory Well drilled under this Agreement and if such well is commenced within the time provided in Section 10.1 and is drilled as proposed in accordance with this Agreement, then, all of the Non-Participating Party's(ies') operating rights and interests in production from such well shall be vested in the Participating Parties in proportion to their Participating Interest, whether or not any instrument evidencing a transfer of rights and interests has been delivered by the Non-Participating Party(ies). The Participating Party(ies) shall have the right to recoup the costs applicable to such well as determined by Section 12.2 and/or Section 12.5 and the drilling of such well shall be governed by Article 12, except that the percentage of recoupment as provided in Section 12.2.1 (a) shall be eight hundred percent (800%) of the Non-Participating Party's Share of the cost of drilling the well.

If the well is not commenced within the time period provided in Section 10.1, the effect shall be as if the proposal had not been made.

10.5 Substitute Well. If, prior to reaching the proposed depth or objective zone or zones to be tested for the Initial Exploratory Well or Exploratory Well as originally proposed, the Participating Party or Parties encounter mechanical difficulties, impenetrable formation, and/or

Unofficial Copy Office of Chris Daniel District Clerk

Gulf Coast conditions which render drilling impossible, then the Participating Party of Parties, or any of them, shall have the right to carry out the original proposed operation by drilling a Substitute Well. Operations for the Substitute Well shall be commenced within sixty (60) days after the date the drilling a Substitute Well. Operations for the Substitute Well shall be commenced as if it were the original proposed Initial Exploratory Well or Exploratory Well for which it is the substitute; and the relationship, rights and obligations as between the Participating Party and Non-Participating Party or Parties shall be the same as if the Substitute Well were, in fact, the proposed Initial Exploratory Well or Exploratory Well, as applicable.

10.6 Course of Action After Drilling to Initial Objective Depth. At such time as an Exploratory Well has been drilled to the initial objective depth as proposed, or a mutually agreed upon lesser depth, and all approved logs, cores, and other tests have been completed, and the results thereof furnished to the Participating Parties, Operator shall notify the Participating Parties setting forth Operator's recommendation to either:

(a) conduct additional coring, testing, or logging of the formations encountered;

(b) attempt completion, with a deeper completion having priority over a shallower completion attempt;

(c) deepen the well;

(d) Sidetrack the well to another bottom hole location not deeper than the stratigraphic equivalent of the initial objective depth;

(e) perform other operations on the well; or

(f) plug and abandon the well.

The Participating Parties, within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal Holidays, after receipt of Operator's recommendation, shall respond thereto by either approving it or making another proposal. If another proposal is made, the Participating Parties shall have an additional twenty-four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, to respond thereto. If conflicting proposals are made, the priority of operations shall be given first to (a) above and next to (b) above and so forth. Failure of a Participating Party to respond to a proposal shall be deemed a negative response. There shall be no dual completion of any well drilled pursuant to this Agreement without the concurrence of all Participating Parties.

10.6.1 Operation by All Parties. Subject to Section 10.6.4, if all Participating Parties approve a proposal, Operator shall conduct the operation at the Participating Parties' cost and risk.

10.6.2 Operations by Fewer than All Parties. If one (1) or more Parties having a combined Participating Interest in the well of twenty-five percent (25%) or more approve a proposal and agree to bear the cost, risk and liabilities (including loss of the hole due to deepening of any well) thereof, except a proposal to plug and abandon, Operator shall conduct the same as a Non-Consent Operation for such Parties pursuant to the provisions of Article 12, except that the percentage of recoupment as provided in Section 12.2.1(a) shall be the same as provided for in Section 10.4(b). If no proposal receives the required approval, the well shall be plugged and abandoned at the expense of all Participating

Unofficial Copy Office of Chris Daniel District Clerk

Parties unless any Participating Party notifies Operator within twenty-four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, after the end of the last applicable election period that it desires to immediately assume all costs and risks including liabilities of further operations, in which event Operator shall, as promptly as possible, commence the proposed operation pursuant to the provisions of Article 12. In the event there is more than one (1) Participating Party, each of which is willing to assume all costs, risks and liabilities of further operations, but each desires to perform a different operation, then the order of priority as listed above herein shall prevail and govern.

10.6.3 Obligations and Liabilities of Participating Parties. If the decision is to complete at initial objective depth, to plug back and complete at a lesser depth, to deepen or to Sidetrack to another bottomhole location, a Party, by becoming a Non-Participating Party, shall be relieved of the obligations and liabilities as to such operation, except as to its share of the costs of plugging and abandoning that portion of the well in which it was a Participating Party.

10.6.4 Deepening or Sidetracking of Non-Consent Exploratory Well. Subject to the terms of Section 10.6 above, if drilling to the initial objective depth does not result in a well which will be qualified as a Producible Well and the decision is to drill deeper or Sidetrack, each Non-Participating Party shall be notified by the Operator of such decision. Any Non-Participating Party may then agree to participate in a deepening or Sidetracking operation by notifying the Operator, within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, after receiving notice of the decision. In such event any Non-Participating Party which elects to participate in deepening or Sidetracking the well as proposed shall immediately pay to the Participating Parties its Participating Interest share of the costs of the well as if it had originally participated to the initial objective depth or that point the Sidetracking operation is commenced if lesser than the initial objective depth. Thereafter such Non-Participating Party shall be deemed for all purposes to be a Participating Party as to such deepening or Sidetracking operations, and the provisions of Section 10.4 shall not be applicable to such Party as to the deepened or Sidetracked portion of the well. The initial Participating Parties, however, shall continue to be entitled to recoup out of the proceeds received from production from the Non-Consent Well any balance remaining pursuant to the terms specified in Section 10.4 applicable to such Non-Consent Well, less the amount paid by a Non-Participating Party pursuant to this Section 10.6.4.

10.6.5 Plugging and Abandoning Cost. The Participating Parties shall pay all costs of plugging and abandoning except any costs associated with a subsequent Non-Consent Operation. The participants in a subsequent Non-Consent Operation shall pay any plugging and abandoning costs associated with such operation. A Non-Consent Operation does not include the abandonment of the original wellbore above the depth at which the Non-Consent Operation commenced.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 11

DEVELOPMENT OPERATIONS

11.1 Operations by All Parties. Any Party may propose Development Operations, including any wells (whether drilling, completing, recompleting, deepening, deviating or Sidetracking, plugging back or working over), Platform, Facilities and/or Subsequent Facilities required by such operations, by submitting a Development Operation AFE to the other Parties for approval pursuant to the response to notice procedures set forth in Article 9. If all Parties elect to participate in the proposed operation, Operator shall conduct such operation at their cost and risk.

11.2 Second Opportunity to Participate. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more elect to participate, the Operator shall inform the Parties of the elections made, whereupon any Party originally electing not to participate may then elect to participate by notifying the Operator within forty-eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays. This provision shall apply only in the event that there are three (3) or more Parties to this Agreement.

11.3 Final Election to Participate. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more approve any proposed operation, the Operator, immediately after the expiration of the applicable response time, shall inform the Parties who have elected to participate of the total interest of the Parties approving such operation. Each Participating Party, within forty-eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of such notice, shall advise the Operator of its desire to: (a) limit participation to such Party's interest as shown on the proposed AFE; or (b) carry its proportionate part of Non-Participating Parties interests. Failure to advise the proposing Party shall be deemed an election under (a), notwithstanding Section 9.4. Should any Party elect to limit its participation to its interest as shown on the proposed AFE, the remaining Participating Parties shall carry the Non-Participating Parties interest in such proportions as the remaining Participating Parties agree to by mutual consent. In the event a drilling rig is on location, the time permitted for any response under this Article 11 shall not exceed a total of forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays. This provision shall apply only in the event that there are three (3) or more Parties to this Agreement.

11.4 Operations by Fewer Than All Parties. If fewer than all but one (1) or more Parties having a combined Working Interest of twenty-five percent (25%) or more elect to participate in and agree to bear all of the cost, risk and liability of a Development Operation, Operator shall conduct such operation pursuant to Article 12.

11.5 Timely Operations. Development Operations shall be commenced within one hundred twenty (120) days following the date upon which the last applicable election may be made; however, the one hundred twenty (120) day period shall automatically be extended for an additional period, not to exceed sixty (60) days, as may be necessary, in order to obtain all applicable required regulatory permits so long as applications for such required permits were properly filed within thirty (30) days after the last applicable election date. If no operations are commenced within such time period, the effect shall be as if the proposal had not been made.

Unofficial Copy Office of Chris Daniel District Clerk

Operations shall be deemed to have commenced: (a) on the date the contract for a new Platform is let, if the notice indicated a need for such Platform, or (b) on the date the rig charges begin according to the terms of the drilling contract. For all other Development Operations, Development Operations shall be deemed to have commenced on the day charges are incurred pursuant to an approved AFE.

11.6 Substitute Well. If, prior to reaching the proposed depth or objective zone or zones to be tested for the Development Operation as originally proposed, the Participating Party or Parties encounter mechanical difficulties, impenetrable formation, and/or Gulf Coast conditions which render further drilling impossible, then the Participating Party or Parties, or any of them, shall have the right to carry out the original proposed operation by drilling a Substitute Well. Operations for the Substitute Well shall be commenced within sixty (60) days after the date the drilling operations cease on the well for which the Substitute Well is a substitute. Operations for the Substitute Well shall be commenced as if it were the original proposed Development Operation, and the relationship, rights and obligations as between the Participating Party and Non-Participating Party or Parties shall be the same as if the Substitute Well were, in fact, the proposed Development Operation, as applicable.

11.7 Course of Action After Drilling to Initial Objective Depth. At such time as a Development Well has been drilled to the objective depth and all approved logs, cores and other tests have been completed and results thereof furnished to the Participating Parties, Operator shall notify the Participating Parties setting forth Operator's recommendation to either:

(a) conduct additional coring, testing, or logging of the formations encountered;

(b) attempt completion, with a deeper completion having priority over a shallower completion attempt;

(c) deepen the well;

(d) Sidetrack the well to another bottom hole location not deeper than the stratigraphic equivalent of the initial objective depth;

(e) perform other operations on the well; or

(f) plug and abandon the well.

The Participating Parties, within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of Operator's recommendation, shall respond thereto by either approving it or making another proposal. If another proposal is made, the Participating Parties shall have an additional twenty-four (24) hours to respond thereto. If conflicting proposals are made, the priority of operations shall be given first to (a) above and next to (b) above and so forth. Failure of a Participating Party to respond to a proposal shall be deemed a negative response.

11.7.1 Operations by All Parties. If all Participating Parties approve a proposal, Operator shall conduct the operation at the Participating Parties' cost and risk.

11.7.2 Operations by Fewer than All Parties. If fewer than all but one (1) or more Parties having a combined Participating Interest in the well of twenty-five percent (25%) or more approve a proposal and agree to bear the cost, risk, and liabilities (including loss

Unofficial Copy Office of Chris Daniel District Clerk

of the hole due to deepening of any well) thereof, except a proposal to plug and abandon, Operator shall conduct the same as a Non-Consent Operation for such Parties pursuant to the provisions of Article 12. If no proposal receives the required approval, the well shall be plugged and abandoned at the expense of all Participating Parties unless any Participating Party notifies Operator within twenty-four (24) hours after the end of the last applicable election period that it desires to immediately assume all costs and risks including liabilities of further operations, in which event Operator shall, as promptly as possible, commence the proposed operation pursuant to the provisions of Article 12. In the event there is more than one (1) Party, each of which is willing to assume all costs, risks and liabilities of further operations, but each desires to perform a different operation, then the order of priority as listed above herein shall prevail and govern.

11.7.3 Obligations and Liabilities of Participating Parties. If the decision is to complete at initial objective depth, to plug back and complete at a lesser depth, to deepen or to Sidetrack to another bottomhole location, a Party, by becoming a Non-Participating Party, shall be relieved of the obligations and liabilities as to such operation, except as to its share of the costs of plugging and abandoning that portion of the well in which it was a Participating Party.

11.8 Deeper Drilling. If a well is proposed to be drilled below the deepest Producible Reservoir penetrated by a Producible Well, any Party may elect to participate either in the well as proposed or to the base of the deepest Producible Reservoir. A Party electing to participate in such well to the base of said Producible Reservoir shall bear its proportionate part of the cost and risk of drilling to said Producible Reservoir including completion or abandonment. All operations below the depth to which such Party agreed to participate shall be governed by Article 12. However, if the proposal to drill below the deepest Producible Reservoir penetrated by a Producible Well meets the requirements of an Exploratory Operation, the percentage of recoupment shall be that specified in Section 10.4(b) and shall be subject to the provisions of Article 10 with respect to such operations.

Unofficial Copy Office of Chris Daniel District Clerk

11.9 Plugging and Abandoning Cost. The Participating Parties shall pay all costs of plugging and abandoning except any costs associated with a subsequent Non-Consent Operation. The participants in a subsequent Non-Consent Operation shall pay any plugging and abandoning costs associated with such operation. A Non-Consent Operation does not include the abandonment of the original wellbore above the depth at which the Non-Consent Operation commenced.

11.10 Subsequent Facilities. The affirmative vote of two (2) or more Parties having a combined Participating Interest of fifty percent (50%) or more in the wells to be served by the proposed Subsequent Facilities shall constitute approval for the construction of such Subsequent Facilities and all Parties having an interest in the wells to be served shall be bound by such approval and be required to participate in the costs therefor. Nothing hereunder shall limit a Party's rights under Section 21.1 to incur additional costs for separate facilities.

11.11 Contracts. Operator may enter into contracts with independent contractors for Development Operations and shall utilize competitive bidding.

ARTICLE 12

NON-CONSENT OPERATIONS

12.1 Non-Consent Operations. Operator shall conduct Non-Consent Operations at the sole risk, expense, and liability of the Participating Parties, in accordance with the following provisions:

12.1.1 Non-Interference. Non-Consent Operations shall not interfere unreasonably with any other operations being conducted within the Contract Area.

12.1.2 Multiple Completion Limitation. Non-Consent Operations shall not be conducted in a well having multiple completions unless: (a) each completion is owned by the same Parties participating in the Non-Consent Operations and in the same proportions; (b) the well is incapable of producing from any of its completions; or (c) all Participating Parties in the well consent to such operations.

12.1.3 Metering. In Non-Consent Operations, production need not be separately metered, but subject to approval by appropriate governmental authority, may be determined on the basis of well tests.

12.1.4 Non-Consent Well. Operations on a Non-Consent Well shall not be conducted in any Producible Reservoir penetrated by a Producible Well without written approval of each Non-Participating Party unless these four (4) conditions are satisfied: (a) such Producible Reservoir shall have been designated in the notice as an objective zone; (b) completion of such well in said Producible Reservoir will not increase the well density governmentally prescribed or approved for such Producible Reservoir; (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in such well and any existing well in the same Producible Reservoir will be at least one thousand (1,000) feet if an oil-well completion or two thousand (2,000) feet if a gas-well completion; and (d) completion of such well as a producer will not cause or result in a decreased "MER" or "MPR" for any existing Producible Reservoir or Producible Well. The terms "MER" and "MPR" are defined under 30 Code of Federal Regulations, Subpart K-Production rates, Parts 250.170 through 250.177.

12.1.5 Cost Information. Operator shall, within one hundred twenty (120) days after completion of a Non-Consent Well, furnish the Parties an inventory and either a joint interest billing or an itemized statement of the cost of such well and equipment pertaining thereto. Operator shall furnish to the Parties a quarterly statement showing operating expenses and the proceeds from the sale of production from the well for the preceding three (3) month period.

12.1.6 Completion. For the purposes of determinations hereunder, each completion shall be considered a separate well.

Unofficial Copy Office of Chris Daniel District Clerk

12.2 Forfeiture of Interest. Upon commencement of Non-Consent Operations, each Non-Participating Party's leasehold operating rights in the Non-Consent Operation and title to production therefrom shall be owned by and vested in each Participating Party in proportion to its Participating Interest or in proportions agreed to by the Participating Parties for as long as the operations originally proposed are being conducted or production is obtained, subject to the following:

12.2.1 Production Reversion. Such leasehold operating rights and title to production shall revert to each Non-Participating Party at 7:00 a.m. on the day following the date when the Participating Parties have recouped out of the Non-Participating Party's Share of the proceeds of production from such Non-Consent Operations an amount, which when added to any amounts received under Section 12.3, equals the sum of the following:

(a) Six hundred percent (600%) of the Non-Participating Party's Share of the cost of drilling, testing, completing, recompleting, working over, deepening, deviating or Sidetracking, plugging back, or temporarily plugging and abandoning each Non-Consent Well (or any Non-Consent Operation(s) in a joint well), and equipping it through the wellhead connections, reduced by any contribution received under Article 20; plus

(b) Two hundred percent (200%) of the Non-Participating Party's Share of the cost of any Non-Consent Facilities necessary to establish the production resulting from the operations defined in Section 12.2.1.(a) above; plus

(c) One hundred twenty five percent (125%) of the Non-Participating Party's Share of the cost of any Platform in which it does not participate and which must be installed to establish the production resulting from the operations defined in Section 12.2.1.(a) above; plus,

(d) One hundred twenty five percent (125%) of the Non-Participating Party's Share of the cost of using any existing Platform, whether or not owned by the Joint Account; plus,

(e) One hundred twenty five percent (125%) of the Non-Participating Party's Share of the cost of using any existing Facilities not owned by the Joint Account, including leased facilities; plus

(f) One hundred percent (100%) of the Non-Participating Party's Share of gathering, treating, and operating expenses, royalties, and severance, production, and other similar taxes.

At 7:00 a.m. upon the day following the date of recoupment of such costs, a Non-Participating Party shall become a Participating Party in such operations.

12.2.2 Non-Production Reversion. If such Non-Consent Operations fail to obtain production or if such operations result in production which ceases prior to recoupment by the Participating Parties of the penalties provided for above, such operating rights shall revert to each Non-Participating Party except that all wells (or portions thereof associated with any Non-Consent Operation(s) in a joint well), Platforms and Facilities of the Non-

Unofficial Copy Office of Chris Daniel District Clerk

Consent Operations, as well as all liabilities and benefits related thereto, shall remain vested in the Participating Parties; however, any salvage in excess of the sum remaining under Section 12.2.1 shall be credited to all Parties.

12.3 Deepening or Sidetracking of Non-Consent Development Well. If any Participating Party proposes to deepen or Sidetrack a Non-Consent Development Well, a Non-Participating Party may participate by notifying the Operator within thirty (30) days after receiving the proposal (forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, if a rig is on location) that it will join in the deepening or Sidetracking operation and by paying to the Participating Parties; 1) if it is a deepening an amount equal to the costs of the well as if such Non-Participating Party had originally participated to the objective depth or; 2) if it is a sidetrack operation an amount equal to the Non-Participating Parties share of drilling the non-consent well to that point the Sidetracking operation is commenced. The Participating Parties shall continue to be entitled to recoup the full sum specified in Section 12.2.1 applicable to the non-consent portion of the well out of the proceeds received from production from the non-consent portion of the well, less any amount received under this Section 12.3.

12.4 Operations from Non-Consent Platforms and Facilities. Subject to the following, a Party which did not originally participate in a Platform or Facilities shall be a Non-Participating Party as to ownership therein and all operations thereon until the Participating Parties as to such Platform or Facilities have recouped the full sum specified in Section 12.2.1 applicable to such non-consent Platform or Facilities and the Non-Consent Operations which resulted in the setting of such Platform or Facilities and other Non-Consent Operations thereon or therefrom. However, any original Non-Participating Party may participate in additional operations from such Platform or Facilities by notifying the Operator within thirty (30) days after receiving a proposal for operations from such Platform or Facilities that it will join in such proposed operations by paying to the Participating Parties in such Platform or Facilities an amount equal to the non-consent penalty provided for in Section 12.2.1 applicable to such Non-Participating Party's Share of the actual cost of such Platform or Facilities, less any recoupment therefor previously obtained. Thereafter, such original Non-Participating Party in such non-consent Platform or Facilities shall own its proportionate share thereof. The Participating Parties in such non-consent Platform or Facilities shall continue to be entitled to recoup the full sum specified in Section 12.2.1 applicable to any other Non-Consent Operations thereon or therefrom.

12.5 Discovery or Extension from Mobile Drilling Operations. If a Non-Consent Well is drilled from a mobile drilling rig or floating drilling vessel and results in the discovery of oil or gas or extension of a Producible Reservoir and, if within one (1) year from the date the drilling equipment is released, a Platform or other fixed structure is ordered and if its location is within three thousand (3,000) feet from the vertical projection of the bottom-hole location of any such well (unless limited by surface restrictions or seabed conditions), the recoupment of costs applicable to such well shall be governed by Section 12.2 and shall be recovered by the Participating Parties in the following manner:

(a) If such Non-Consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of the Non-Participating Party's Share of

Unofficial Copy Office of Chris Daniel District Clerk

production from all subsequently completed wells on the Contract Area which are completed in the Producible Reservoir discovered or extended by such Non-Consent Well and in which the Non-Participating Party in such Non-Consent Well has a Participating Interest.

(b) If such Non-Consent Well is completed and produced, recoupment shall be out of the Non-Participating Party's Share of all production from such Non-Consent Well and one-half (1/2) of the Non-Participating Party's Share of production from all subsequently completed wells on the Contract Area which are completed in the Producible Reservoir discovered or extended by such Non-Consent Well and in which the Non-Participating Party in such Non-Consent Well has a Participating Interest.

12.6 Non-Consent Operations to Maintain Lease. Notwithstanding any other provision hereof, if a Lease has no wells thereon capable of commercial production in the final six (6) months of the primary term of such Lease and such Lease is not held by a unit or a Suspension of Production pursuant to other operations on the Lease or in the unit, any Party electing not to participate in the drilling of a well or other operation in the final six (6) months of the primary term or at any time during the secondary term, shall assign its full interest in the Lease pro-rata to the Parties hereto undertaking the drilling of such well or participating in such operation. Such assignment shall be executed and delivered within thirty (30) days after commencement of the well or operation. If at any time after the expiration of the primary term of the Lease, a well must be drilled or an operation conducted because of cessation of production or to fulfill an obligation to develop the Lease, such well or operation being required to extend the term of the Lease or a portion thereof, any Party electing not to participate in the operation or the drilling of such a well shall assign its full interest in the Lease, or portion thereof, pro-rata to the Parties hereto undertaking the drilling of such a well. Such assignment shall be executed and delivered within thirty (30) days after commencement of the well or operation, but shall be limited to the portion of the Lease the term of which was extended by the operation or drilling the well, and provided any Non-Participating Party shall retain its rights and liabilities with respect to any previously completed wells on the Lease and the production therefrom. Should the Parties electing to undertake the drilling of a well or conduct operations under this Section 12.6 fail to perform, as Participating Parties, the drilling of the well or operations substantially as proposed, the Parties receiving the aforementioned assignment shall assign back to the Party(ies) originally electing not to participate, that interest which was caused to be assigned pursuant to this Section 12.6. A Party hereunder executing an assignment of its interest in the Lease pursuant to the foregoing shall not be relieved of any obligation hereunder accruing prior to such assignment. If more than one (1) well is drilled or more than one (1) operation conducted, any of which would maintain or extend the Lease or such portions thereof, an assignment shall not be required from any Party participating in any such well(s) or operation(s) as to that portion of the Lease or unit which would have been maintained by such well(s) or operation(s).

12.7 Allocation of Platform Costs to Non-Consent Operations. Non-Consent Operations shall be subject to further conditions as follows:

Unofficial Copy Office of Chris Daniel District Clerk

12.7.1 Charges. If a Non-Consent Well is drilled from a Platform, the Participating Parties in such well shall be liable to the Joint Account owners of the Platform for the use of the Platform and its Facilities as follows:

(a) Such Participating Parties shall pay a sum equal to that portion of the total cost of the Platform which one (1) Platform slot bears to the total number of slots on the Platform. If the Non-Consent Well is abandoned, the right of Participating Parties to use that Platform slot shall terminate, unless such Parties commence drilling a substitute well from the same slot within ninety (90) days after abandonment.

(b) If the Non-Consent Well production is handled through the Facilities, the Participating Parties shall pay a sum equal to that portion of the total cost of such Facilities, less accumulated depreciation, which one (1) well completion bears to the total number of Producible Well completions utilizing the Facilities.

12.7.2 Operating and Maintenance Charges. The Participating Parties shall pay on a monthly basis all costs necessary to connect a Non-Consent Well to the Facilities and that proportionate part of the expense of operating and maintaining the Platform and Facilities applicable to the Non-Consent Well. Platform and Facilities operating and maintenance expenses shall be allocated in proportion to the producing well count during a calendar month as it relates to the total number of wells producing from such Platform during such calendar month. For the purpose of this provision, a producing zone or each completion in a multi-completed well shall be considered as a separate well.

12.7.3 Payments. Payment of sums pursuant to Section 12.7.1 is not a purchase of an additional interest in the Platform or Facilities. Such payments, if the recoupment provisions of Section 12.2 are applicable, shall be included in the total amount which the Participating Parties are entitled to recoup out of production from the Non-Consent Well.

12.8 Allocation of Costs Between Depths (Single Completion). For the purpose of allocating costs on any well with a single completion in which the Participating Interests of the Parties are not the same for the entire depth or the completion thereof, the cost of drilling, completing, equipping, and plugging and abandoning such well shall be allocated on the following basis:

(a) Intangible drilling, completion, casing string, and material costs from the surface to a depth one hundred feet (100') below the base of the Producible Reservoir in which the well is completed shall be charged to the Participating Parties in such completion in accordance with their respective Participating Interest.

(b) Intangible drilling, completion, casing string, and material costs, other than tubing costs, from a depth of one hundred feet (100') below the base of the Producible Reservoir in which the well is completed to total depth shall be charged to the Participating Parties in the well to total depth in accordance with their respective Participating Interest.

Unofficial Copy Office of Chris Daniel District Clerk

(c) All plugging and abandonment costs directly associated with the Producible Reservoir in which the well is completed will be allocated to the Participating Parties in that completion in accordance with their respective Participating Interests. All final plugging and abandonment costs associated with the wellbore will be allocated proportionately among all Participating Parties in the well.

12.9 Allocation of Costs Between Depths (Multiple Completions). For the purpose of allocating costs on any well completed in dual or multiple Producible Reservoirs in which the Participating Interests of the Parties are not the same for the entire depth or the completion thereof, the cost of drilling, completing, equipping, and plugging and abandoning such well shall be allocated on the following basis:

(a) Intangible drilling, completion, casing string, and material costs other than tubing costs, from the surface to a depth one hundred feet (100') below the base of the upper completed Producible Reservoir shall be divided equally between the completed Producible Reservoirs and charged to the Participating Parties in each Producible Reservoir in accordance with their respective Participating Interest.

(b) Intangible drilling, completion, casing string, and material costs, other than tubing, from a depth one hundred feet (100') below the base of the upper completed Producible Reservoir to a depth one hundred feet (100') below the base of the second completed Producible Reservoir shall be divided equally between the second and any other Producible Reservoir completed below such depth and charged to the Participating Parties in each such Producible Reservoir in accordance with their respective Participating Interest. If the well is completed in additional Producible Reservoirs, the costs applicable to each such Producible Reservoir shall be determined and charged to the Participating Parties in the same manner as prescribed for wells completed in dual Producible Reservoirs.

(c) Intangible drilling, completion, casing string, and material costs, other than tubing costs, from a depth one hundred feet (100') below the base of the lowest completed Producible Reservoir to total depth shall be charged to the Participating Parties in the well to total depth in accordance with their respective Participating Interest.

(d) Costs of tubing strings serving each separate Producible Reservoir shall be charged to the Participating Parties in each Producible Reservoir in accordance with their respective Participating Interest.

(e) For the purposes of allocating tangible and intangible costs between Producible Reservoirs that occur at less than one hundred feet (100') intervals, the distance between the base of the upper reservoir to the top of the next lower reservoir shall be allocated equally between reservoirs.

Unofficial Copy Office of Chris Daniel District Clerk

(f) All plugging and abandonment costs directly associated with a Producible Reservoir will be allocated to the Participating Parties in that reservoir in accordance with their respective Participating Interests. All final plugging and abandonment costs associated with the wellbore will be allocated proportionately among all Participating Parties in the well.

12.10 Allocation of Costs Between Depths (Dry Hole). For the purpose of this Section, a dry hole shall mean a well drilled to an objective depth in which the Participating Parties elected not to complete, or if completed, the well was not a Producible Well and did not establish a Producible Reservoir. In allocating costs on any well containing a dry hole, and in which the Participating Interests of the Parties are not the same for the entire depth or the completion thereof, the cost of drilling and plugging and abandoning such well shall be allocated on the following basis:

(a) Costs to drill and plug and abandon a well proposed for completion in single, dual, or multiple objective depths shall be charged to the Participating Parties in the same manner as if the well had established a Producible Reservoir at each objective depth.

(b) Additional plugging and abandoning costs related to any deepening, completion attempt, or other operation shall be at the sole risk and expense of the Participating Parties in such operation.

12.11 Intangible Drilling and Completion Cost Allocations. For the purposes of allocating costs under Sections 12.8, 12.9, and 12.10, intangible drilling and completion costs, including non controllable materials costs, shall be allocated between Producible Reservoirs, including dry holes as defined in Section 12.10, and including the interval from one hundred feet (100') below the deepest Producible Reservoir to total depth on a drilling day ratio basis where the factor for each reservoir is determined by a fraction for which the numerator is the number of drilling and completion days applicable to that reservoir and the denominator is the total number of days spent on the well, beginning on the day the rig arrives on location and terminating when the rig is released.

12.12 Subsequent Operations in Non-Consent Well. Except as provided in Section 10.6.4 or 12.3, as applicable, an election not to participate in the drilling, Sidetracking, or deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-Participating Party's recoupment amount. A subsequent operation conducted during the recoupment period by the Parties entitled to participate shall be subject to the recoupment provided in Section 12.2.1.

ARTICLE 13

ABANDONMENT AND SALVAGE

13.1 Platform Salvage and Removal Costs. When the Parties owning a Platform mutually agree to dispose of such Platform, it shall be disposed of by the Operator as approved by such Parties with such Parties having a preferential right to acquire the Platform. The costs, risks,

Unofficial Copy Office of Chris Daniel District Clerk

and net proceeds, if any, resulting from such disposition shall be shared by such Parties in proportion to their ownership of the Platform.

13.2 Abandonment of Producing Well. Any Participating Party may propose the abandonment of a well by notifying the other Participating Parties. No well shall be abandoned without the mutual consent of the Participating Parties. The Participating Parties not consenting to the abandonment shall pay to each Participating Party desiring to abandon such abandoning Party's share of the current value of the well's salvageable material and equipment as determined pursuant to Exhibit "C", less the estimated current costs of salvaging same and of plugging and abandoning the well as determined by the Participating Parties. In the event such abandoning Party's interest in such salvage value is less than such Party's share of the estimated costs of salvaging materials, plugging and abandoning, the abandoning Party shall pay the Operator, for the benefit of the non-abandoning Parties, a sum equal to the deficiency.

13.3 Assignment of Interest. Each Participating Party desiring to abandon a well pursuant to Section 13.2 shall assign effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in such well and the equipment therein and its ownership in the production from such well. Any Party so assigning shall be relieved, after delivering the assignment, from any further liability with respect to said well, and each non-abandoning Party shall assume and bear all such liabilities in proportion to the share of interest that it receives from the abandoning Parties.

13.4 Abandonment Operations Required by Governmental Authority. Any well abandonment or Platform removal required by a governmental authority shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning such well or Platform in proportion to their Participating Interests.

Unofficial Copy Office of Chris Daniel District Clerk

## ARTICLE 14
## WITHDRAWAL

14.1 Withdrawal. A Party may withdraw from this Agreement by assigning to the other Parties who do not desire to withdraw, all of its interest in the Contract Area and the wells, Platforms and Facilities used in operations thereon; provided that such assignment shall not relieve such Party from any obligation or liability incurred prior to the first day of the month following receipt of the assignment by assignees. The assigned interest shall be owned by the assignees in proportion to their respective Participating Interests. The assignees, in proportion to the respective interests so acquired, shall pay the assignor for its interest in the wells, Platforms and Facilities, the current salvage value thereof less its share of the estimated current cost of salvaging same, plugging and abandoning of wells, and removal of all Platforms and Facilities, as determined by the Parties. In the event such withdrawing Party's interest in such salvage value is less than such Party's share of the estimated costs, the withdrawing Party shall pay the Operator, for benefit of the non-withdrawing Parties, a sum equal to the deficiency. Within sixty (60) days after receiving notice of the assignment, Operator shall render a final statement to the withdrawing Party for its share of all expenses incurred through the first day of the month

following the date of receipt of the assignment, plus any deficiency in salvage value. Providing all such expenses, including any deficiency hereunder due from the withdrawing Party have been paid within thirty (30) days after the rendering of such final statement, the assignment shall be effective the first day of the month following its receipt, and the withdrawing Party shall thereafter be relieved from all further obligations and liabilities with respect to the Contract Area, provided, however, that such withdrawing Party shall remain liable for any costs, expenses, or damages theretofore accrued or arising out of any event accruing prior to such Party's withdrawal.

14.2 Limitations on Withdrawal. No Party shall be relieved of its obligations hereunder during a blowout, a fire, or other emergency, but may withdraw from this Agreement after termination of such emergency, provided such Party shall remain liable for its share of all costs arising from said emergency. Notwithstanding Section 14.1, no Party shall be required to accept an assignment of a withdrawing Party's interest. If no Party is willing to accept the assignment, the Party seeking to withdraw shall remain subject to this Agreement.

ARTICLE 15

RENTALS, ROYALTIES, AND OTHER PAYMENTS

15.1 Creation of Overriding Royalty. Any Party whose interest in a Lease is encumbered by an overriding royalty, production payment, or other burden shall hold all other Parties free and harmless from such encumbrances. If any Non-Participating Party's interest is subject to an overriding royalty, production payment, or other charge or burden, then the Participating Parties shall, during recoupment of costs to be recovered under Section 12.2 above, receive the Working Interest production of such Non-Participating Party free from such charge or burden, which shall be paid and discharged by the Non-Participating Party out of his own separate funds. Such Non-Participating Party shall hold the Participating Parties harmless with regard to such payment.

15.2 Payment of Rentals and Minimum Royalties. Operator shall pay in a timely manner for the Joint Account of the Parties all rentals, minimum royalties, or similar payments accruing under the terms of the Lease(s) and submit evidence of each such payment to the Parties. Operator shall not be held liable to the other Parties in damages for the loss of a Lease or interest therein if, through mistake or oversight, any rental, minimum royalty, or other payment is not, or is erroneously paid. The loss of any Lease or interest therein which results from a failure to pay or an erroneous payment of rental or minimum royalty shall be a joint loss and there shall be no readjustment of interest.

15.3 Non-Participation in Payments. Should any Party elect not to pay its share of any rental, minimum royalty, or similar payment, such Party shall notify the other Parties at least sixty (60) days prior to the date on which such payment is due; and, in this event, Operator shall make such payment for the benefit of all the Participating Parties. In such event, the Non-Participating Party shall, upon the request of the Participating Parties, assign to them such portions of its interest in such Lease as would be maintained by such payment. Unless otherwise agreed, such

Unofficial Copy Office of Chris Daniel District Clerk

assigned interest shall be owned by each Participating Party in proportion to its Participating Interest.

15.4 Royalty Payments. Each Party hereto shall be responsible for and shall separately bear and properly pay or cause to be paid all royalties and other amounts which become due on production taken from the Contract Area for its account and on its share of any production used, consumed, or lost on the Contract Area. During any time in which the Participating Parties in a Non-Consent Operation are entitled to receive a Non-Participating Party's Share of production, the Participating Parties shall bear the Lease royalty due on such share of production and shall hold the Non-Participating Parties harmless from liability for such royalty.

ARTICLE 16

TAXES

16.1 Property Taxes. Operator shall render property covered by this Agreement as may be subject to ad valorem taxation and shall pay such property taxes for the benefit of each Party. Operator shall charge each Party its share of such tax payments. If the Operator is required hereunder to pay ad valorem taxes based in whole or in part upon separate valuation of each Party's Working Interest, then notwithstanding anything to the contrary herein, charges to the Joint Account as provided in Exhibit "C" shall be made and paid by the Parties hereto in accordance with the percentage of tax value generated by each Party's Working Interest.

16.2 Contest of Property Tax Valuation. Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, Operator may elect to pay under protest. Upon final determination, Operator shall pay the taxes and any interest, penalty, or cost accrued as a result of such protest. In either event, Operator shall charge each Party its share in accordance with each Party's Participating Interest.

16.3 Production and Severance Taxes. Each Party shall pay, or cause to be paid, all production, severance, and excise taxes, due on any production which it receives pursuant to the terms of this Agreement.

16.4 Other Taxes and Assessments. Operator shall pay other applicable taxes (other than income taxes) or assessments and charge each Party its share in accordance with each Party's Participating Interest, provided that should a Party's unilateral action cause a change in status of the entire Lease, Platform or Facilities thereon for tax purposes, that Party shall bear the entire increased portion of taxes caused by that Party's action.

16.5 Gas Balancing. Each Party agrees that with respect to gas production, each Party taking gas under the Gas Balancing Agreement attached hereto as Exhibit "E" shall account for such gas for federal income tax purposes in accordance with proposed Treasury Regulation Section 1.761-2(d)(3), or in accordance with binding laws, rules, regulations, and orders affecting production from the Contract Area which hereafter may be adopted, promulgated, or issued by an agency or other governmental authority having jurisdiction over the Contract Area.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 17

INSURANCE

17.1 Insurance. Operator shall at times when operations are conducted herein during the term of this Agreement, carry, pay for and charge each Party its proportionate share of the cost of (i) Worker's Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal laws and (ii) Contingent Maritime Employer's Liability Insurance. The Worker's Compensation policy shall have attached the "Longshoreman's Harbor Worker's Compensation Act (Federal) Endorsement" and "Outer Continental Shelf Land's Endorsement". The Contingent Maritime Employer's Liability Insurance shall provide for a limit of liability of not less than $1,000,000 per accident. Such policies shall contain waivers of subrogation in favor of Non-Operators. Each Party to this Agreement shall be responsible for insuring its own interest in property and equipment, well control and redrill expense, or loss of income and any other loss not covered by the insurance referred to herein. Each Party for its account shall carry, pay for and maintain throughout the term of this Agreement policies of insurance specified in Exhibit "B" of this Agreement.

ARTICLE 18

LIABILITY, CLAIMS AND LAWSUITS

18.1 Individual Obligations. The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and nothing contained herein shall ever be construed as creating a partnership of any kind, joint venture, association, or other character of business entity recognizable in law for any purpose. Each Party shall hold all the other Parties harmless from liens and encumbrances on the Contract Area arising as a result of its acts.

18.2 Notice of Claim or Lawsuit. If a claim is made against any Party or if any Party is sued on an alleged cause of action arising out of operations hereunder or an alleged cause of action involving title to any interest subject hereto, such Party shall give prompt written notice to the other Parties.

18.3 Settlements. Operator may settle any single damage claim or suit involving operations or title to any interest hereunder if the expenditure does not exceed Fifty Thousand Dollars ($50,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds such amount, the Participating Parties shall determine the further handling of the claim or suit. Operator will keep the Participating Parties appropriately advised of all material events in each lawsuit and claim arising from operations hereunder.

18.4 Legal Expense. Legal expenses shall be handled pursuant to Exhibit "C"; however, such legal expenses shall be approved and borne in accordance with Exhibit "C" by only the Participating Parties in the operations out of which such liability giving rise to same occurs.

18.5 Liability for Losses, Damages, Injury or Death. Liability for losses, damages, injury, or death arising from operations under this Agreement shall be borne by the Parties in

Unofficial Copy Office of Chris Daniel District Clerk

proportion to their Participating Interests in the operations out of which such liability arises, except when such liability results from the sole or concurrent gross negligence or willful misconduct of a Party or Parties, in which case such Party or Parties shall be liable.

18.6 Indemnification. To the extent allowed by law, the Participating Parties agree to hold the Non-Participating Parties harmless and to indemnify and protect them against all claims, demands, liabilities and liens for property damage or personal injury, including death, caused by or otherwise arising out of Non-Consent Operations, and any loss and cost suffered by any Non-Participating Party as an incident thereof except where the negligent act or omission of the Non-Participating Party contributes to such loss or cost.

ARTICLE 19

INTERNAL REVENUE PROVISION

19.1 Internal Revenue Provision. Attached hereto and made a part hereof is Exhibit "F", entitled "Tax Provisions", which contains the agreement of the Parties with regard to Income Tax matters under this Agreement.

ARTICLE 20

CONTRIBUTIONS

20.1 Notice of Contributions Other than Advances for Sale of Production. Each Party shall promptly notify the other Parties of all contributions which it may obtain, or is attempting to obtain, in support of the drilling of any well on the Lease. Payments received as consideration for entering into a contract for sale of production from the Contract Area, loans, and other financing arrangements shall not be considered contributions for the purposes of this Article.

20.2 Cash Contributions. In the event a Party contracts for a cash contribution toward the drilling of a well, said cash contribution shall be paid to Operator and Operator shall apply the amount thereof against the cost of such drilling. If such well is a Non-Consent Well, the amount of the contribution shall be deducted from the cost specified in Section 12.2.1.(a).

20.3 Acreage Contributions. In the event a Party contracts for an acreage contribution toward the drilling of a well, such Party shall tender an assignment of the acreage, without warranty of title, to the Participating Parties in the proportions said Parties shared the cost of drilling the well. Such acreage shall become a separate contract area and, to the extent possible, be subject to provisions identical to those contained in this Agreement. For purposes of this Agreement, the word "acreage" shall mean lands or leases or interests therein.

Unofficial Copy Office of Chris Daniel District Clerk

ARTICLE 21

DISPOSITION OF PRODUCTION

21.1 Facilities to Take in Kind. Any Party shall have the right, at its sole risk and expense, to construct Facilities for taking its share of production in kind, provided that such Facilities, at the time of installation, do not interfere with continuing operations on the Lease.

21.2 Taking Production in Kind. Each Party shall take in kind and separately dispose of its share of the oil and/or condensate and gas produced and saved from the Lease.

21.3 Failure to Take in Kind. If any Party fails to take in kind and dispose of its share of the oil and/or condensate, Operator shall have the option, but not the obligation, to either (a) purchase oil and/or condensate at Operator's posted price for liquids of the same kind, gravity, and quality in the field where the Lease is located or, in the absence of such posted price, at the price prevailing in the field or area for oil and/or condensate of the same kind, gravity, and quality, or (b) sell such oil and/or condensate to others under commercially reasonable terms negotiated by Operator in good faith , subject to revocation at will by the non-taking Party. All contracts of sale by Operator of any Party's share of oil and/or condensate shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any contract be for a period in excess of one hundred and eighty (180) days. Proceeds of all sales made by Operator pursuant to this Section shall be paid to the Parties entitled thereto. Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party. If any Party fails to take in kind or dispose of its share of gas, such gas shall be accounted for in accordance with the provisions of Exhibit "E", Gas Balancing Agreement, attached hereto and made a part hereof.

21.4 Expenses of Delivery in Kind. Any cost incurred in making delivery of any Party's share of oil and/or condensate or disposing of same pursuant to Section 21.3, shall be borne by such Party.

21.5 Gas Balancing Provisions. The Parties agree that in the event separate disposition of gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it, the gas balancing or accounting between the Parties shall be handled in accordance with the attached Exhibit "E".

ARTICLE 22

APPLICABLE LAW

22.1 Applicable Law. THIS AGREEMENT AND ALL OPERATIONS CONDUCTED HEREUNDER BY THE PARTIES SHALL BE SUBJECT TO ALL VALID AND APPLICABLE FEDERAL LAWS, RULES, REGULATIONS AND ORDERS ("FEDERAL LAW"). TO THE EXTENT REQUIRED BY FEDERAL LAW, THE LAWS OF THE STATE ADJACENT TO THE CONTRACT AREA SHALL APPLY. THIS AGREEMENT SHALL OTHERWISE BE GOVERNED BY AND CONSTRUED IN

Unofficial Copy Office of Chris Daniel District Clerk

ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS EXCLUSIVE OF ANY PROVISIONS THAT WOULD DIRECT THE APPLICATION OF THE SUBSTANTIVE LAW OF ANY OTHER JURISDICTION.

ARTICLE 23

LAWS, REGULATIONS AND NONDISCRIMINATION

23.1 Laws and Regulations. This Agreement and all operations and activities conducted under it shall comply with all applicable laws and governmental regulations (federal, state, and local). In case of conflict between directions given by the Parties and the provisions of this Agreement or the laws or regulations, the laws or regulations, or the provisions of this Agreement, shall govern in that order.

23.2 Nondiscrimination. In the performance of work under this Agreement, the Parties agree to comply, and Operator shall require each independent contractor to comply, with the governmental requirements set forth in Exhibit "D" and with all of the provisions of Section 202(1) to (7), inclusive, of Executive Order No. 11246, as amended.

ARTICLE 24

FORCE MAJEURE

24.1 Force Majeure. The obligations imposed by this Agreement on a Party, except for indemnity obligations and the payment of money, shall be suspended with respect to such Party to the extent that compliance is prevented, in whole or in part, by a labor dispute, fire, flood, war, civil disturbance, or act of God; by laws; by governmental rules, regulations, or orders; by inability to secure materials; or by any other cause, whether similar or dissimilar, beyond the reasonable control of the said Party; provided, however, that performance shall be resumed within a reasonable time after such cause has been removed; and provided further that no Party shall be required against its will to settle any labor dispute.

24.2 Notice. Whenever a Party's obligations are suspended under Section 24.1, such Party shall immediately notify the other Parties and give full particulars of the reason for such suspension.

ARTICLE 25

SUCCESSORS, ASSIGNS AND TRANSFER OF INTEREST

25.1 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, representatives and assigns and shall constitute a covenant running with the Lease.

25.2 Transfer of Interest. A Party may sell, farmout, transfer or assign all or any part of its interest in the Lease, provided that:

Unofficial Copy Office of Chris Daniel District Clerk

(a) Any such sale, farmout, transfer or assignment shall be made only to a financially responsible Party or Parties.

(b) Such Party shall provide the other Parties a copy of the fully executed assignment/farmout agreement within thirty (30) days after all signatures on the assignment/farmout agreement have been obtained.

(c) Such Party shall incorporate in such instrument evidencing the sale, farmout, transfer, assignment or other disposition a provision making the same expressly subject to this Operating Agreement and shall obtain (and furnish to the other Parties) such transferee's written consent to be bound by all the provisions of this Operating Agreement.

25.3 Assignments. Any assignment, vesting, or relinquishment of interest between the Parties shall be without warranty of title, either express or implied, except for any liens, claims, or encumbrances arising by, through, or under the assigning Party.

ARTICLE 26

AREA OF MUTUAL INTEREST

26.1 Area of Mutual Interest. The lands identified in Exhibit "A-1" hereto shall hereinafter be referred to as the "Area of Mutual Interest", or "AMI". If any Party hereto ("Acquiring Party") acquires either an Oil and Gas Lease (or any interest therein) or any other mineral interest covering lands lying within the AMI, or if the Acquiring Party enters into any type of agreement by which such an interest may be earned or otherwise acquired by conducting drilling, seismic, or other operations on lands lying within the AMI, then the Acquiring Party shall promptly notify the other parties of such acquisition or agreement.

The notification provided for above shall contain all available title information, and copies of leases, agreement by which the interests may be acquired, and other pertinent instruments. It shall also describe in detail the cost and expense of such acquisition and any other obligation which may be incurred pursuant thereto. If drilling, seismic, or other operations are not required to acquire the interest, each Party shall have fifteen (15) days from receipt of notice thereof in which to elect to participate in such acquisition to the extent of its working interest as set forth on Exhibit "A". Failure to notify the acquiring party of its election within fifteen (15) days shall be deemed an election not to participate in such acquisition.

If the acquisition requires drilling, seismic, or other operations on the lands lying within the AMI, the election of a party to participate in such operations shall be deemed an election to participate in the agreement governing such operations, to the extent necessary to acquire the interest. No party shall be required to make such election more than sixty (60) days nor less than fifteen (15) days prior to commencement of initial operations. Operations necessary to acquire the interest shall be governed by this agreement.

To receive an assignment of its proportionate share of the interest acquired as a result of conducting drilling, seismic, or other operations on the AMI, the receiving party (the "Assignee(s)") must have: (1) participated in all operations necessary for the acquisition of the

Unofficial Copy Office of Chris Daniel District Clerk

interest, including, but not limited to completion operations necessary for the acquisition of the interest, and also must have paid all costs and expenses incurred in connection therewith; (2) participated in any previous drilling, seismic, or other operations that were necessary or were a condition precedent to the operations resulting in the acquisition of the interest; and (3) participated in accordance with the terms, provisions, covenants and conditions of the agreements governing the acquisition of the interest.

Unless otherwise agreed, the Acquiring Party and the Assignee(s) shall share in the acquisition in the proportion that each such party's respective working interest as set forth on Exhibit "A" bears to the sum of the working interest of the Acquiring Party and the Assignee(s). Upon the receipt of an invoice from the Acquiring Party setting forth in detail the cost and expense of the acquisition and satisfaction thereof, by the Assignee. The Acquiring Party shall then promptly assign to the Assignee(s) its proportionate interest in the acquisition. Any assignments hereunder shall be made free and clear of mortgages (unless such mortgages are subordinated to this agreement), claims, liens overriding royalty interests, production payments, net profits interests, and other encumbrances or leasehold burdens placed thereon by the assigning party or resulting from its ownership and operation of such lease or interest on and after the date of this instrument, as reflected by the records of the appropriate parish, except such burdens which the lease or interest was burdened when acquired by the party but otherwise without warranty of title, either express or implied.

Unofficial Copy Office of Chris Daniel District Clerk

## ARTICLE 27
## TERM

27.1 Term. This Agreement shall remain in effect so long any Lease or part thereof within the Contract Area remains in force and effect and thereafter until: (a) all wells within the Contract Area have been abandoned and plugged or turned over to a single Working Interest owner in accordance with Article 14; (b) all equipment and any real property acquired for the Joint Account has been disposed of by Operator; and (c) there has been a final accounting made under this Agreement, including settlement of any gas imbalances pursuant to Exhibit "E".

## ARTICLE 28
## EXECUTION

28.1 Counterpart Execution. This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all the Parties had signed the same instrument.

28.2 Amendments. No amendments hereof shall be effective unless they are in writing and executed by the relevant Parties.

28.3 Waiver. Failure to act upon a breach of any provision of this Agreement does not waive a Party's right to enforce a subsequent breach of the same or any other provision.

IN WITNESS WHEREOF, this Agreement has been executed by the Parties on the date shown below, but effective as of the day and year first above written.

**WITNESSES:**

Ralph J. Daigle

Alfred J. Thomas II

**OPERATOR:**

**PetroQuest Energy One, L.L.C.**

By: Charles T. Goodson

Charles T. Goodson
President and Chief Executive Officer

**WITNESSES:**

Barbara B. McClarty

**NON-OPERATOR:**

**LLOG Exploration & Production Company**

By: Harold N. Gariz

Harold N. Garic
Treasurer

SIGNATURE PAGE to Offshore
Operating Agreement dated October 1, 1999, by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

Unofficial Copy Office of Chris Daniel District Clerk

LOUISIANA
STATE OF ~~TEXAS~~ §
§
~~COUNTY OF HARRIS~~ §
PARISH OF LAFAYETTE

On this 21st day of October, 1999, before me appeared Charles T. Goodson, to me personally known, who, being by me duly sworn, did say that he is the President and Chief Executive Officer of PetroQuest Energy One, L.L.C. and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.

Notary Public

My Commission Expires at death

STATE OF LOUISIANA §
§
COUNTY OF JEFFERSON §

On this 18th day of October, 199_, before me personally appeared Harold T. Garic, to me personally known, who, being by me duly sworn, did say that he is the Treasurer of LLOG Exploration & Production Company, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and acknowledged said instrument to be the free act and deed of said corporation.

Notary Public

My Commission expires: ____________________

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "A"**

Attached to and made a part of that certain Operating Agreement
dated October 1, 1999,
by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

**I. Oil and Gas Leases Contributed to this Agreement (Contract Area)**

| OCS-G | Area | Block | Lease Dated |
|---|---|---|---|
| 14428 | Vermilion Area, South Addition | 376 | 5/1/94 |

**DEPTH RESTRICTION**

**INSOFAR AND ONLY INSOFAR AS THE ABOVE LEASES COVER RIGHTS FROM THE SURFACE DOWN TO 9,000'.**

Unofficial Copy Office of Chris Daniel District Clerk

**II. Designated Representatives**

PetroQuest Energy One, L.L.C.
10333 Richmond Ave., Suite 710
Houston, Texas 77042
Attn: Mr. Vic Luszcz
Telephone No. 713-784-8300
Telecopy No. 713-784-8327

LLOG Exploration & Production Company
433 Metairie Road, Suite 600
Metairie, Louisiana 70005
Attn: Gerry Whitman
Telephone No. 504-833-7700
Telecopy No. 504-828-5276

**III. Interests of the Parties**

| | Working Interest in Initial Test Well Drilled in Block 376 to casing point* | Working Interest 1) after casing point in Initial Test Well drilled in Block 376 and 2) all subsequent operations.* |
|---|---|---|
| PetroQuest | 33.3333% | 50% |
| LLOG | 66.6667% | 50% |

* as provided for in that certain Participation Agreement dated October 1, 1999, by and between PetroQuest and LLOG Exploration & Production Company, casing point in each Initial Test Well is defined as that point in time when said Well has penetrated the objective formation, all testing has been completed and a recommendation has been made to run production casing. All subsequent costs on the Block in which said Initial Test Well was drilled shall be shared in proportion to each participating party's working interest.


Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated October 1, 1999, by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

Area of Mutual Interest (AMI)

| OCS-G | Area | Block | Lease Dated |
|---|---|---|---|
| N/A | Vermilion Area, South Addition | 374 | unleased |
| 14427 | Vermilion Area, South Addition | 375 | 5/1/94 |
| 14428 | Vermilion Area, South Addition | 376 | 5/1/94 |

DEPTH RESTRICTION

INSOFAR AND ONLY INSOFAR AS THE ABOVE LEASES COVER RIGHTS FROM THE SURFACE DOWN TO 9,000'.

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "B"**
**INSURANCE**

Attached to and made a part of that certain Operating Agreement dated October 1, 1999, by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

**INSURANCE PROVISIONS**

1 Operator shall carry the following insurance for the joint account:

a. Workmen's Compensation and Employer's Liability Insurance covering employees of Farmee engaged in operations hereunder in compliance with all applicable State and Federal Laws. The Workmen's Compensation policy shall have attached the "Longshoreman's Harbor Worker's Compensation Act (Federal) Endorsement" and "Outer Continental Shelf Lands Endorsement".

b. Contingent Maritime Employer's Liability Insurance shall provide for a limit of liability of not less than $1,000,000 per accident.

2. Each Party shall carry the insurance noted below with the minimum limits as set out:

a. General Liability and Property Damage Insurance endorsed to include offshore operations and non-owned watercraft liability, covering operations conducted hereunder with a combined single limit each occurrence of $1,000,000 for bodily injury and property damage.

b. Commercial Automobile Liability Insurance covering owned, non-owned and hired automobiles with a combined single limit of $1,000,000 per occurrence and Property Damage Insurance covering operations conducted hereunder with a combined single limit each occurrence of $500,000 for bodily injury and property damage.

c. Excess Liability Insurance, including sudden and accidental pollution liability, with a limit of $10,000,000.00.

d. Insurance for Control of Well, Redrilling and Restoration due to blowout and/or cratering above or below surface, and Seepage and Pollution Liability coverage including cleanup and containment with a minimum limit of $25,000,000 per occurrence. Coverage shall also include Care Custody and Control Insurance with a minimum limit of $500,000 per occurrence.

3. Any Party hereto may acquire such additional insurance as it deems proper to protect itself against any claims, losses, damages or destruction arising out of operations hereunder.

4. Operator shall use reasonable efforts to require all contractors and subcontractors working or performing services hereunder to comply with the Workmen's Compensation and Employer's Liability Laws, both State and Federal, and to carry Comprehensive General Liability and such other insurance as Operator deems necessary.

5. In the event that construction operations are performed, Operator shall determine the amount(s) of Builder's Risks Insurance appropriate for the project and shall: (i) cause the pertinent contractor(s) and, as applicable, subcontractor(s) to carry, in the aggregate and as Operator deems appropriate, such coverage and/or (ii) carry for the joint account (and charge it accordingly) for such portion of, of all, the coverage as operator deems appropriate. In any such event, Operator shall cause certificates of insurance reflective of such coverage to be forwarded to the Non-Operator(s) .

**END OF EXHIBIT "B"**

Unofficial Copy Office of Chris Daniel District Clerk

Recommended by the Council of Petroleum Accountants Societies

606 BOX 800 TULSA, OK 74101

COPAS

EXHIBIT " C "

Attached to and made a part of that certain Offshore Operating Agreement dated October 1, 1999 by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. Definitions

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties of this Agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property, and shall include any officer or director of Operator*

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

*who is directly employed in technical work for the benefit of the Joint Account.

2. Statements and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. Advances and Payments by Non-Operators

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhatten Bank NY on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1987 by the Council of Petroleum Accountants Societies.



Unofficial Copy Office of Chris Daniel District Clerk

COPAS—1984—OFFSHORE
Recommended by the
Council of Petroleum
Accountants Societies



5. Audits

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 7 of this Section II.

(3) Salaries of First Level Supervisors in the field.

(4) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

(5) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.



Unofficial Copy Office of Chris Daniel District Clerk

Recommended by the Council of Petroleum Accountants Societies

COPAS

6. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel directly engaged in the operation of the Joint Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and/ or Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not to exceed ten percent (10 %) per annum. In addition, for platforms only, the rate may include an element of the estimated cost of platform dismantlement. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

10. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

11. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Compensation and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage under State and Federal laws and charge the Joint Account at Operator's cost not to exceed manual rates.

12. Communications

Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's nearest Shore Base Facility. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 7 of this Section II.

13. Ecological and Environmental

Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Bureau of Land Management or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil spills as required by applicable laws and regulations.

14. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

15. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

Unofficial Copy Office of Chris Daniel District Clerk

Recommended by the Council of Petroleum Accountants Societies

COPAS

## III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

i. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:
( ) shall be covered by the overhead rates.
( xx ) shall not be covered by the overhead rates.

ii. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel, either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:
( ) shall be covered by the overhead rates.
( xx ) shall not be covered by the overhead rates.

1. Overhead – Drilling and Producing Operations
As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on either:
( xx ) Fixed Rate Basis, Paragraph 1A, or
( ) Percentage Basis, Paragraph 1B

A. Overhead – Fixed Rate Basis

(1) Operator shall charge the Joint Account at the following rates per well per month:
Drilling Well Rate $ 27,000 (Prorated for less than a full month)
Producing Well Rate $ 2,731

(2) Application of Overhead – Fixed Rate Basis for Drilling Well Rate shall be as follows:

(a) Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive calendar days.

(b) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead – Fixed Rate Basis for Producing Well Rate shall be as follows:

(a) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(c) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(d) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(e) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(4) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development
_______ Percent ( %) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating
_______ Percent ( %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary



Unofficial Copy Office of Chris Daniel District Clerk

Recommended by the Council of Petroleum Accountants Societies

COPAS

recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, or deepening of any or all wells, and shall also include any remedial operations requiring a period of five (5) consecutive work days or more on any or all wells; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2. Overhead – Major Construction
To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ 75,000 .

A. If the Operator absorbs the engineering, design and drafting costs related to the project:
(1) 5 % of total costs if such costs are more than $ 75,000 but less than $100,000; plus
(2) 3 % of total costs in excess of $100,000 but less than $1,000,000; plus
(3) 2 % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:
(1) 3 % of total costs if such costs are more than $ 75,000 but less than $100,000; plus
(2) 2 % of total costs in excess of $100,000 but less than $1,000,000; plus
(3) 1.5 % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

3. Overhead – Catastrophe
To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:
(1) 3 % of total costs through $100,000; plus
(2) 2 % of total costs in excess of $100,000 but less than $1,000,000; plus
(3) 1.5 % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. Amendment of Rates
The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases
Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions
Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)
(1) Tubular Goods Other than Line Pipe

*Operator shall account for material puchase and transfer in accordance with COPAS Interpretation 23, attached hereto, or the pricing procedure most recently recommended by COPAS.



Unofficial Copy Office of Chris Daniel District Clerk