(a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

Unofficial Copy Office of Chris Daniel District Clerk

Recommended by the Council of Petroleum Accountants Societies

COPAS

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(4). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Unofficial Copy Office of Chris Daniel District Clerk

**COPAS INTERPRETATION #23**
**ISSUED: May 1, 1992**
**SUBJECT: Material Transfer Valuation**

PREFACE

This COPAS Interpretation has been reviewed by the Petroleum Accountants Societies through representation on the Joint Interest and Audit Standing Committees and approved by the Board of Directors of the Council of Petroleum Accountants Societies and is recommended as a guide for valuing materials transferred to/from joint interest operations.

PROBLEM

COPAS Accounting Procedures require the use of manufacturers' published prices and/or current new prices as listed by a reliable supply store as the means of pricing material transferred to/from the joint property. The intent of these pricing mechanisms is to reasonably reflect the actual fair market value of the material on the date of transfer.

Decreasing domestic drilling activity beginning in 1982 contributed significantly to an erosion in prices for material goods. Many manufacturers and suppliers have chosen not to maintain their published prices to be reflective of selling price for competitive and other marketing reasons. Data gathered by the Materials Subcommittee of the Joint Interest Standing Committee confirms that manufacturers' published prices do not reasonably reflect market value of the materials transferred.

A basic concept of Joint Operations is that the Operator should neither gain nor lose economically from being the Operator of a joint property. Following current written provisions, Operators are sometimes in a gain position with respect to valuing inventoried or transferred material. A need exists for material transfer prices to be more sensitive to market prices.

INTERPRETATION

The valuation of material transferred to/from the joint property should be generally reflective of market value on the date of transfer. Therefore, COPAS recommends the following valuation methods be adopted as a basis for pricing material transferred to/from the joint property:

1. Published Prices as adjusted by the appropriate Historical Price Multiplier (HPM) in effect on the date of material movement (Note 1). The HPMs will be based on historical data and be published by COPAS periodically (Note 2).

2. If neither published prices nor an HPM are available, the Operator should obtain a price quotation from a reputable supplier/manufacturer which reflects a realistic acquisition cost.

3. Historical purchase price providing it reflects a realistic acquisition cost on date of movement. Sufficient audit access should be provided to Non-Operators for purposes of verifying material transfer valuation.

4. As agreed by the parties.

Note 1: The Historical Price Multiplier is an index to be applied to Manufacturers' Published Prices which will provide a price approximating a realistic acquisition cost on the date of movement.

Note 2: The COPAS Computerized Equipment Pricing System (CEPS) will be modified to incorporate the HPM's by material family (or category).

Approved by COPAS Board of Directors, May 1, 1992

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "D"**

Attached to and made a part of that certain Operating Agreement
dated October 1, 1999,
by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

**NON-DISCRIMINATION AND CERTIFICATION OF NON-SEGREGATED FACILITIES**

In order to ensure compliance with the Equal Employment Opportunity provisions of Executive Orders 11246, 11375, 11598, 11141 and 11758, the Operator agrees to and shall be bound by these provisions and all rules and regulations promulgated thereunder, and with all amendments and additions thereto to the extent that they are applicable.

I. Equal Opportunity Clause

(Applicable to contracts in excess of $10,000)

Operator shall be bound by and agrees to the following provisions as contained in Section 202 of Executive Order 11246, as amended, to-wit:

(1) The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex, age or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

(2) The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, age or national origin.

(3) The Operator will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under Section 202 of Executive Order 11246 and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4). The Operator will comply with all provisions of Executive Order 11246 and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Operator will furnish all information and reports required by Executive Order 11246 and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

(6) In the event of the Operator's noncompliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 and such other sanctions may be imposed

Unofficial Copy Office of Chris Daniel District Clerk

and remedies invoked as provided in Executive Order 11246 or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Operator will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: PROVIDED, HOWEVER, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

II. Certification of Nonsegregated Facilities

Operator certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise. It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Nonsegregated Facilities as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The Certification may be submitted either for each subcontract or for all subcontracts during a period, i.e., quarterly, semiannually, or annually. (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)

III. Employer Information Report (EEO-1, Standard Form 100)

If Operator has 50 or more employees and is required under Part 60 of Title 41 of the Code of Federal Regulations to file Employer Information Report, EEO-1 (Standard Form 100), Operator hereby certifies that it has done so or if not agrees that it will file such Report in accordance with the applicable instructions and will continue to file such Report unless or until Operator is not required by law or regulation to so file.

IV. Affirmative Action Compliance Program

Unofficial Copy Office of Chris Daniel District Clerk

Operator may be required under Part 60 of Title 41 of the Code of Federal Regulations to develop a written Affirmative Action Compliance Program, if Operator has 50 or more employees and the contracts amount to $50,000 or more. If Operator is so required, it agrees to do so no later than 120 days after the effectiveness of the contracts and maintain such Program until such time as it is no longer required by law or regulations.

V. Utilization of Minority Business Enterprises

(Applicable to contracts in excess of $5,000, except contracts for services which are personal in nature)

(a) It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(b) The Operator agrees to use its best efforts to carry out this policy in the award of its subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by a minority group member or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Blacks, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American-Aleuts. Operator may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

VI. Minority Business Enterprises Subcontractor Program

(Applicable to contracts in excess of $500,000)

(a) The Operator agrees to establish and conduct a program which will enable minority business enterprises (as defined in the clause entitled "Utilization of Minority Business Enterprises") to be considered fairly as subcontractors and suppliers under this contract. In this connection, the Operator shall:

(1) Designate a liaison officer who will administer the Operator's minority business enterprises program.

(2) Provide adequate and timely consideration of the potentialities of known minority business enterprises in all "make-or-buy" decisions.

(3) Assure that known minority business enterprises will have an equitable opportunity to compete for subcontracts, particularly by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of minority business enterprises.

(4) Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in this clause, including the establishment of a source list of minority business enterprises, (ii) awards to minority business enterprises on the source list, and (iii) specific efforts to identify and award contracts to minority business enterprises.

(5) Include the Utilization of Minority Business Enterprises clause in subcontracts which offer substantial minority business enterprises subcontracting opportunities.

(6) Cooperate with the Contracting Officer in any studies and surveys of the Operator's minority business enterprises procedures and practices that the Contracting Officer may from time to time conduct.

Unofficial Copy Office of Chris Daniel District Clerk

(7) Submit periodic reports of subcontracting to known minority business enterprises with respect to the records referred to in subparagraph (4), above, in such from and manner and at such time (not more often than quarterly) as the Contracting Officer may prescribe.

(b) The Operator further agrees to insert, in any subcontract hereunder which may exceed $500,000, provisions which shall conform substantially to the language of this clause, including this paragraph (b), and to notify the Contracting Officer of the names of such subcontractors.

VII. Employment of the Handicapped

(Applicable to contracts for $2,500 or more)

The affirmative action clause and regulations (as amended from time to time) promulgated by the Secretary of Labor, or his or her designee, and to implement Section 503 of the Rehabilitation Act of 1973, P.L. 93-112, as amended, and found in Part 60 of Title 41 of the Code of Federal Regulations, are incorporated by reference and made a part hereof, and Operator agrees to comply with such affirmative action clause and regulations to the extent applicable.

V. Disabled Veterans and Veterans of the Vietnam Era

(Applicable to contracts for $10,000 or more)

The affirmative action clause and regulations (as amended from time to time) promulgated by the Secretary of Labor, or his or her designee, to implement Section 2012 of the Vietnam Era Readjustment Act of 1974, P.L. 93-508, and found in Part 60 of Title 41 of the Code of Federal Regulations, are incorporated by reference and made a part hereof, and Operator agrees to comply with such affirmative action clause and regulations to the extent applicable.

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "E"**

Attached to and made a part of that certain Operating Agreement dated October 1, 1999, by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

**GAS BALANCING AGREEMENT**

Unofficial Copy Office of Chris Daniel District Clerk

1. The parties to the Operating Agreement referred to above own working interests in the gas rights underlying the lands and leases covered by such agreement ("Contract Area") in accordance with the percentages of participation ("Working Interest") set forth therein.

2. Each party has the right to take, market, or otherwise dispose of its working interests share of gas produced from the Contract Area. Each party's Working Interest share shall be calculated on the volumes taken in MCF's by each party or its purchaser(s). In the event any party at any time does not take in kind or market its Working Interest share of gas, or has contracted to sell its Working Interest share of gas to a purchaser which fails to take all of such gas, the other parties shall be entitled, in proportion to their Working Interest, to produce, take and deliver each month up to one hundred percent (100%) of the anticipated allowable gas production to be assigned by the governmental entity having jurisdiction (if applicable). The purpose of this provision is to permit any party not taking or marketing all of its Working Interest share of current gas production to defer its production and permit the other parties to pass clear title to quantities of gas in excess of their Working Interest.

3. Each party which fails to take or market its full Working Interest share of gas at any time shall be credited with gas in an imbalance account equal to that volume of gas taken or marketed by other parties hereto in excess of their Working Interest.

4. Each party shall endeavor to take or market its full Working Interest share of gas production from the Contract Area. Further, each party shall give Operator reasonable notice and sufficient data either to nominate such party's Working Interest share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas. Except as and to the extent caused by Operator's gross negligence or willful misconduct, Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Non-Operator.

5. To allow for the recovery of gas from an imbalance account and to balance the gas account of the parties, a party which has taken less than its full Working Interest share of gas at any time ("negative balance") shall be entitled to produce, take and deliver each month upon reasonable notice to the Operator and to the other affected parties, its Working Interest share of the anticipated gas production to be assigned by the governmental entity having jurisdiction (if applicable) plus an amount up to an additional fifty percent (50%) ("Make-up Gas") of the Working Interest share of each party which has taken more than its full share of gas at such time ("positive balance"). However, a party with a negative balance shall never be allowed to take more than its Working Interest share of such allowable gas (if applicable) during the months of November, December, January and February. If more than one party has a negative balance and elects to take Make-up Gas, they shall divide the Make-up Gas to be taken from any party with a positive balance in proportion to the respective working interest participation of each such party with a negative balance.

6. If, at the permanent termination of production of gas from the Contract Area, an imbalance exists between the parties, statements or invoices for a monetary settlement of the imbalance between any of the parties shall be issued within one hundred eighty (180) days. Operator shall provide all parties with a final cumulative balance for each party upon receipt of all relevant data from other parties after permanent termination of production. For the purposes hereof, the value per unit in calculating a monetary settlement shall be defined as the weighted average of the actual values received by a party with a positive balance on all of its gas sales in

excess of its Working Interest share ("Extra Gas"), beginning when such party was last in balance. If such party did not sell all or part of such Extra Gas, such Extra Gas not sold will be valued in the same manner used for production and severance taxes when produced. The amount of monetary settlement due each party with a negative balance shall be determined by: (a) multiplying the value per unit received by each party with a positive balance by the volume of gas (same unit basis) such party has produced; (b) subtracting production and severance taxes (and royalties if paid on a gas taken rather than on a working interest basis) paid on such Extra Gas; (c) totaling the figures computed in (a) and (b) for all parties with a positive balance; and (d) allocating to each party with a negative balance its pro rata share of the total reached in (c) above on the basis of the ratio of each party's negative balance volume to the total negative balance volumes for all parties. Each party with a positive balance shall provide a settlement schedule to each party with a negative balance detailing how its settlement amount was calculated. That portion of the proceeds by each party with a positive balance which is or may be subject to refund or other dispute by order(s) of the FERC, the Minerals Management Service, the courts or other authorities may be withheld by such party until such prices or disputes are fully resolved, unless the relevant parties with a negative balance furnish satisfactory undertakings agreeing to hold the relevant parties with a positive balance harmless from any financial loss due to the orders or disputes. Settlement as provided herein shall also be made by any party with a positive balance prior to any sale, assignment or other disposition of all or any part of its interest in the Contract Area. If the provisions of this Agreement are breached by the transferring party, any party receiving any part of the transferred interest shall be jointly and severally liable for its pro rata share of such positive balance upon the demand of any party with a negative balance.

7. Balancing payments from parties with a positive balance to parties with a negative balance under this Agreement shall be paid not later than sixty (60) days (1) after the amount of the monetary settlement due such party has been determined and a statement or invoice issued, or (2) after the date when the period for calculation of amounts due has passed, whichever is the earlier, pursuant to the provisions of Paragraph 6 above. No interest shall accrue or be due among the parties as to the period prior to this payment date. Interest on late payments (including payments rightfully made on a late basis because amounts are subject to potential refund or other dispute as stated in Paragraph 6 above or which are delayed because computations are not timely completed) shall accrue at the prime rate in effect at Chemical Banking Corp., New York, New York, at noon on the first day of the month in which the payment due date occurs plus two percent (2%) or the maximum contract rate permitted by applicable law, whichever is less. Attorneys' fees, court costs and other reasonable costs of collection of amounts owning due to breach of this Agreement shall also be payable to the affected party(ies).

8. Each party taking gas shall promptly furnish or cause to be furnished to Operator a monthly statement of gas taken. Operator shall regularly furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from the Contract Area, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Each party shall retain records of volumes of gas taken or marketed and revenues or values accruing thereto for the full term of the Operating Agreement and two (2) years thereafter. Any party with either a positive or negative balance shall have the right during the two (2) years following each statement/invoice due date under Paragraph 6 above to audit the records of the other parties with positive or negative balances as to volumes, revenues, values and other relevant information. No party will use any of the information obtained pursuant to the provisions of this paragraph for any other purpose than implementing the terms of this Agreement and enforcing rights thereunder.

9. In addition to any rights granted in the Operating Agreement, if any well produces casinghead gas and any party is not selling all of its Working Interest share, Operator shall have the right but not the obligation to sell the non-selling party's share of casinghead gas for the account of each party.

10. Each Party hereto shall share in and own the condensate recovered at the wellhead in accordance with its Working Interest in such well as provided in the Operating Agreement.

11. Gas used in lease operations, vented or lost shall not be considered taken by any party for purposes of the balancing hereunder. Nothing herein shall change or affect each party's obligation to pay its Working Interest share of all costs and liabilities incurred in accordance with such party's Working Interest.

Unofficial Copy Office of Chris Daniel District Clerk

12. At all times while gas is produced from the Contract Area, unless otherwise required by any laws, rules or regulations, each party shall make appropriate settlement of all overriding royalties and other payments out of or in lieu of production for which it is responsible ("overriding royalty payments") as if each party were taking or delivering to a purchaser its Working Interest share and its Working Interest share only, of such gas production. Each party hereto agrees to defend, indemnify and hold each other party hereto harmless from all claims for such overriding royalty payments asserted by third parties to which any party hereto is accountable.

13. Each party taking or marketing gas hereunder shall pay, or cause to be paid, all royalties (other than overriding royalty payments) and all production and severance taxes due on all volumes of gas actually taken or marketed by such party, unless otherwise required by any laws, rules or regulations.

14. Nothing contained herein shall be construed to deny any party the right, from time to time,to produce and take or deliver to its purchaser the entire well stream, if necessary, to meet such deliverability tests as may be reasonably required by its gas sales contract.

15. The parties shall communicate, as necessary, the contents of this Agreement to any of their respective gas purchasers or transporters and monitor their respective deliveries so as to ensure to the extent reasonably practicable that such third parties do not take gas in excess of the quantities provided herein.

16. This Agreement shall remain in force and effect as long as the Operating Agreement is in effect and thereafter until the gas balance accounts of the parties are settled in full or the audit period provided in Paragraph 8 has expired, whichever shall be longer. The obligations of the parties shall survive the termination of this Agreement.

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "F"**

There is no Exhibit "F" to this Agreement
And this page is intentionally included and left blank.

Unofficial Copy Office of Chris Daniel District Clerk

**EXHIBIT "G"**

Attached to and made a part of that certain Operating Agreement dated October 1, 1999,by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

<u>MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT</u>

(________)

To be filed in the conveyance records and in the mortgage records and as a non-standard financing statement in accordance with Paragraph 11.0 herein.

1.0 This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by PetroQuest Energy One, L.L.C. whose address is ______________________________, and LLOG Exploration & Production Company whose mailing address is ____________________, (the "Non-Operator(s)").

2.0 The Operator and the Non-Operator are parties to that certain Operating Agreement dated the 1st day of October, 1999 ( "Operating Agreement") providing for the development and production of crude oil, natural gas and associated substances from the lands and oil and gas leases described in Exhibit "A" of the Operating Agreement (therein and herein called the "Contract Area"), and described more particularly on Attachment "1" to this Memorandum, and designating PetroQuest Energy One , to conduct such operations for itself and the Non-Operator. Reference is made hereby to the Operating Agreement for all purposes, and its terms and provisions are incorporated herein by this reference to the same extent as if the Operating Agreement were reproduced herein. Capitalized terms not otherwise defined herein are defined and shall have the same meaning herein as set forth in the Operating Agreement.

3.0 The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

4.0 Among other provisions, the Operating Agreement (i) provides for certain liens and security interests to secure payment by the parties of their respective share of costs and performance of other obligations under the Operating Agreement and contains a power of sale, (ii) contains an Accounting Procedure, (iii) includes non-consent clauses which establish that parties who elect not to participate in certain operations shall be deemed to have relinquished their interest in production until the carrying consenting parties recover their costs of such operations plus a specified amount, or in some cases to permanently forfeit their interest in all or part of the Lease, and (iv) grants preferential rights to purchase. Certain provisions of Section 8.6 of the Operating Agreement are set forth as follows:

> <u>First Lien in Favor of the Operator</u>. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, each Non-Operator, to secure the performance of and payment by such Non-Operator to the Operator of all obligations and indebtedness, whether now owed or hereafter arising, of such Non-Operator to the Operator pursuant to this Agreement, grants to the Operator a lien upon the following described property:
>
> (a) all of its rights, titles, and interests, including, without limitation, any Working Interest, whether now owned and existing or hereafter acquired or arising, in and to (1) the Lease, subject to any surface acreage or depth limitations set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, (2) all fixtures on or used or obtained for use in connection with the Lease or the

Unofficial Copy Office of Chris Daniel District Clerk

Contract Area, and (3) all other real property susceptible of the lien granted hereby located within the Contract Area;

(b) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any rights-of-way or other documents described in Exhibit "A" and all renewals and extensions thereof and all new oil, gas and mineral leases, rights-of-way, or other documents (i) in which it acquires an interest after the termination or expiration of any Lease, right-of-way, or other document described in Exhibit "A", and (ii) that cover all or any part of the property described in and covered by such terminated or expired Lease, right-of-way, or other document, to the extent, and only to the extent, such new oil, gas and mineral leases, rights-of-way, or other documents may cover the property that was described in and covered by such terminated or expired Lease, right-or-way or other document; and

(c) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any of the oil, gas, and minerals in, on, or under the Contract Area, including, without limitation, all contractual rights, operating rights, leasehold interests, working interests, royalty interests, overriding royalty interests, non-participating royalty interests, mineral interests, production payments, net profits interests, or any other interest measured by or payable out of production of oil, gas, or other minerals from the Lease or production attributable to the Contract Area (as such interests may be enlarged by the discharge of any payments out of production or by the removal of any charges or encumbrances).

<u>Security Interest in Favor of the Operator</u>. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, each Non-Operator, to secure the performance of and payment by such Non-Operator to the Operator of all obligations and indebtedness, whether now owed or hereafter arising, of such Non-Operators to the Operator pursuant to this Agreement, each such Non-Operator grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired or arising, in and to (a) all oil, gas, and other minerals produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced; (b) all accounts receivable accruing or arising as a result of the sale of such oil, gas, and other minerals (including, without limitation, accounts arising from gas imbalances or from the sale of oil, gas and other minerals at the wellhead); (c) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (d) all platforms, wells, facilities, fixtures, tools, tubular goods, other personal property, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used or obtained for use in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area, and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof, excluding, however, any platforms, wells, facilities, fixtures, equipment or property located on the Lease or the Contract Area and used exclusively in connection with the ownership, use or exploitation of acreage or depths not included within the Lease or Contract Area. The interest of the Non-Operators in and to the oil, gas, and other minerals produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent permissible under applicable law, the security interest granted by each Non-Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of such

Unofficial Copy Office of Chris Daniel District Clerk

Non-Operator described herein and is intended to cover all of the rights, titles and interests of such Non-Operator in all personal property now or hereafter located upon or used in connection with the Contract Area, whether tangible or intangible, except for property used exclusively in connection with acreage or depths not included in the Lease or Contract Area as aforesaid; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operator in connection with the Lease or the Contract Area, or the oil, gas and other minerals produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise to the extent that it holds, owns, or controls any interest in the Contract Area; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include and are attributable to all or any portion of the Lease or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

Unofficial Copy Office of Chris Daniel District Clerk

Obligations and Indebtedness of Non-Operators Secured. To the extent permissible under applicable law, the liens and security interests granted by each Non-Operator in this Agreement shall secure (a) the performance of and payment by such Non-Operator to the Operator of all of its obligations and indebtedness, whether now owed or hereafter arising pursuant to this Agreement, and (b) the payment of all expenses incurred by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement ("Costs") and other expenses properly charged to such Non-Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs. If any Non-

Operator does not pay such Costs and other expenses when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operator's production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operator's share of production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of Costs and other expenses owed by the defaulting Non-Operator and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operator.

First Lien in Favor of the Non-Operators. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, to secure the performance of and payment by the Operator to each of the Non-Operators of all obligations and indebtedness, whether now owed or hereafter arising, of the Operator to such Non-Operators pursuant to this Agreement, the Operator grants to each such Non-Operator a lien upon the following described property:

(a) all of its rights, titles, and interests, including, without limitation, any Working Interest, whether now owned and existing or hereafter acquired or arising, in and to (1) the Lease, subject to any surface acreage or depth limitations set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, (2) all fixtures on or used or obtained for use in connection with the Lease or the Contract Area, and (3) all other real property susceptible of the lien granted hereby located within the Contract Area;

(b) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any rights-of-way or other documents described in Exhibit "A" and all renewals and extensions thereof and all new oil, gas and mineral leases, rights-of-way, or other documents (1) in which it acquires an interest after the termination or expiration of any Lease, right-of-way, or other document described in Exhibit "A", and (2) that cover all or any part of the property described in and covered by such terminated or expired Lease, right-of-way, or other document, to the extent, and only to the extent, such new oil, gas and mineral leases, rights-of-way, or other documents may cover the property that was described in and covered by such terminated or expired Lease, right-of-way or other document; and

(c) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to any of the oil, gas, and minerals in, on, or under the Contract Area, including, without limitation, all contractual rights, operating rights, leasehold interests, working interests, royalty interests, overriding royalty interests, non-participating royalty interests, mineral interests, production payments, net profits interests, or any other interest measured by or payable out of production of oil, gas, or other minerals from the Lease or production attributable to the Contract Area (as such interests may be enlarged by the discharge of any payments out of production or by the removal of any charges or encumbrances).

Security Interest in Favor of the Non-Operators. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants and agreements contained in this Agreement, to secure the performance of and payment by the Operator to each of the Non-Operators of all obligations and indebtedness, whether now owed or hereafter arising, of the Operator to such Non-Operators pursuant to this Agreement, the Operator grants

Unofficial Copy Office of Chris Daniel District Clerk

to each of the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired or arising, in and to (a) all oil, gas, and other minerals produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced; (b) all accounts receivable accruing or arising as a result of the sale of such oil, gas, and other minerals (including, without limitation, accounts arising from gas imbalances or from the sale of oil, gas and other minerals at the wellhead); (c) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (d) all platforms, wells, facilities, fixtures, tools, tubular goods, other personal property, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used or obtained for use in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area, and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof, excluding, however, any platforms, wells, facilities, fixtures, equipment or property located on the Lease or the Contract Area and used exclusively in connection with the ownership, use or exploitation of acreage or depths not included within the Lease or Contract Area. The interest of the Operator in and to the oil, gas, and other minerals produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all personal property now or hereafter located upon or used in connection with the Contract Area, whether tangible or intangible, except for property used exclusively in connection with acreage or depths not included in the Lease or Contract Area as aforesaid; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Lease or the Contract Area, or the oil, gas and other minerals produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise to the extent that it holds, owns, or controls any interest in the Contract Area; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired or arising, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include and are attributable to all or any portion of the Lease or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements,

Unofficial Copy Office of Chris Daniel District Clerk

oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

Obligations and Indebtedness of the Operator Secured. To the extent permissible under applicable law, the liens and security interests granted by the Operator in this Agreement shall secure (a) the performance of and payment by the Operator to each of the Non-Operators of all of its obligations and indebtedness, whether now owed or hereafter arising pursuant to this Agreement, and (b) the payment of all Costs and other expenses properly charged to the Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs. If the Operator does not pay such Costs and other expenses when due, any Non-Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Operator's production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Operator's share of production until the amount owed has been paid. The Non-Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Operator's share of production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of Costs and other expenses owed by the defaulting Operator and payment made to the Non-Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Operator.

Priority; Successors. Each Party represents and warrants to the other Parties hereto that the lien and security interest granted by such Party to the other Parties shall be a first and prior lien and security interest, and each Party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in the Lease or the Contract Area by, through or under such Party. All Parties acquiring an interest in the Lease or the Contract Area, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest hereunder as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

Waiver. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of this Agreement, to the extent allowed by governing law, the defaulting Party waives any available right of redemption from and after the date of judgment, and any available right to require a marshaling of assets.

Other Lien Rights. Each Party agrees that the other Parties shall be entitled to utilize the provisions of oil and gas lien law or other lien law of any state adjacent to the Contract Area, or that is otherwise applicable, to enforce the obligations and indebtedness of each Party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, each of the Non-Operators agree that the Operator may invoke or utilize the mechanics' or materialmen's lien law of the state adjacent to the Contract Area, or that is otherwise applicable, in order to secure the payment to the Operator of any sum due hereunder for services performed or materials supplied by the Operator.

Unofficial Copy Office of Chris Daniel District Clerk

Power of Sale. To the extent permitted by applicable law, each Party hereby grants to the other parties a power of sale ("Power of Sale") as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by these Power of Sale provisions and in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice, including reasonable notice of intent to foreclose said lien or security right by exercise of such Power of Sale of not less than thirty (30) days. Subject to the provisions of this Agreement, if a Party should elect to foreclose the lien (the "Lien") granted to such party (the "Foreclosing Party") pursuant to this Agreement against the interests in the leasehold estate of the Lease or any future leases comprising the Contract Area ("Real Property Interest") of a Party that has failed to pay any liquidated and undisputed portion of its payment obligations hereunder (the "Defaulting Party"), the Parties hereby authorize a non-judicial sale under the laws of the State of Texas James M. Alexander is hereby appointed as Trustee for such purpose (whether the Trustee named herein or appointed as a substitute or successor Trustee pursuant to the terms of this Agreement, the "Trustee"). The Foreclosing Party may appoint a substitute or successor Trustee in the event the Trustee above named resigns or is unable for any reason to serve, or if the Foreclosing Party should elect at any time (with or without cause) to remove the Trustee. Upon such default, and upon request by the Foreclosing Party to the Trustee to foreclose the Lien pursuant to this Power of Sale, the Trustee shall, at least twenty-one (21) days preceding the date of non-judicial sale, serve written notice of the proposed sale by certified mail on the Defaulting Party according to the records of the Foreclosing Party. Service of such notice shall be deemed completed upon the deposit in a post office or other official depository under the care and custody of the United States Postal Service of such notice enclosed in a post-paid wrapper properly addressed to the Defaulting Party, together with each other Party obligated to pay the obligations secured by the Lien, at the most recent address or addresses shown on the records of the Foreclosing Party. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the facts of service. After such notice, the Trustee shall proceed to sell all of the Real Property Interest of the Defaulting Party in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the Defaulting Party's Real Property Interest in the Contract Area shall not exhaust the Power of Sale, and subsequent sales may be made from time to time until all of such Real Property Interest is sold or the obligations of the Defaulting Party secured by the Lien are paid in full. The Trustee shall have the authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers. It is further agreed that the Trustee may sell the full Real Property Interest of the Defaulting Party in the Contract Area or may limit such sale to such portions of the Real Property Interest of the Defaulting Party in the Contract Area as the Trustee shall deem expedient. After the completion of any sale pursuant hereto, the Trustee shall make, execute, and deliver to the purchaser or purchasers of the Real Property Interest of the Defaulting Party in the Contract Area good and sufficient deeds, assignments, or other lawful conveyances to vest in such purchaser or purchasers title to such Real Property Interest in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto on or subsequent to the effective date of such sale. From the proceeds of such sale, the Trustee shall make disbursements in the following order:

(a) pay all charges, costs, and expenses of executing these provisions;

(b) pay any sums due and paid by the Trustee for taxes in the preservation of the security;

Unofficial Copy Office of Chris Daniel District Clerk

(c) pay to the Foreclosing Party up to the amount necessary to satisfy the Defaulting Party's obligations and indebtedness hereunder; and

(d) the balance, if any, shall be paid to the Defaulting Party.

It is agreed that such sale shall be a perpetual bar against the Defaulting Party and its heirs, successors, assigns, legal representatives, and all other persons claiming under him, them, or any of them. It is further agreed that the Trustee, or any holder or holders of the obligation of the Defaulting Party, or the Foreclosing Party shall have the right to become the purchaser or purchasers at such sale if such Party is the highest bidder or bidders, in which event the bid or bids may be credited upon the indebtedness of the Defaulting Party. It is stipulated and agreed that, in case of any sale hereunder by Trustee or its successor, all prerequisites of such sale shall be presumed to have been performed, and any conveyance given hereunder and all statements of fact or recitals therein made as to (a) the nonpayment of money secured, (b) any default under the terms hereof, (c) the request by the Foreclosing Party to the Trustee to foreclose the Lien, (d) the proper and due appointment of any successor or substitute Trustee, (e) the advertisement of sale, (f) the time, place, and terms of sale, or (g) any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. If the Foreclosing Party consists of more than one Party, actions and directions of the Foreclosing Party under this Power of Sale shall require the approval of the holders of a majority in amount of the Defaulting Party's liquidated and undisputed payment obligations which are then due.

5.0 This Memorandum is to be filed or recorded, as the case may be, in (a) the applicable real estate records of the county or counties adjacent to the offshore blocks contained within the Contract Area, (b) the mortgage records or lien records or other appropriate records of such county or counties, and (c) the appropriate Uniform Commercial Code records of such county or counties and the Secretary of State of Texas. This Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of the Uniform Commercial Code as adopted in the State of Texas (the "Uniform Commercial Code,") and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Secretary of State of the State of Texas, with the Operator being the secured party and the Non-Operator being the debtor with respect to such filing. For the purposes of the security interest in favor of the Non-Operator, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed in such office as a non-standard form of financing statement with the Non-Operator being the secured party and the Operator being the debtor with respect to such filing. With respect to such filing as a financing statement, the security interests created in the Operating Agreement cover minerals or the like (including oil and gas) and accounts subject to subsection (e) of Section 9.103 of the Uniform Commercial Code. In addition, this Memorandum also constitutes a financing statement filed as a fixture filing. All parties to the Operating Agreement are identified on Attachment "1" hereto.

6.0 If payment of any indebtedness created under the Operating Agreement is not made when due under the Operating Agreement, in addition to any other remedy afforded by law, each party to the Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the lien and security interest established in its favor in the Operating Agreement in the manner provided by law or therein and to exercise all rights of a secured party under the Uniform Commercial Code.

7.0 Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness established thereunder, on behalf of all parties to the Operating Agreement, the Operator and the Non-Operator, as appropriate, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum. Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, at any time prior to

Unofficial Copy Office of Chris Daniel District Clerk

the filing of such release and termination instrument, the Operator and the Non-Operator shall have the right to file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum.

8.0 It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

9.0 This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and to their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

10.0 A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

11.0 This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, in each of the records described in Paragraph 5 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy to be indexed in the name of the Operator, as grantor, and one copy to be indexed in the name of the Non-Operator, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured party, and another filing for the Non-Operator, as secured party. The respective addresses of the Operator, as both secured party and debtor, and the Non-Operator, as both debtor and secured party, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

12.0 The Operator and the Non-Operator hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered any instrument, or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

13.0 Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

EXECUTED on the dates set forth below each signature but effective as of the 18th day of October, 1999.

Unofficial Copy Office of Chris Daniel District Clerk

OPERATOR

PetroQuest Energy One, L.L.C.

By: [signature]

Charles T. Goodson
President and Chief Executive Officer

Date: October 18, 1999

NON-OPERATOR:

**LLOG Exploration & Production Company**

**By:** [signature]

**Harold N. Garic**
**Treasurer**
**Date:** October 18, 1999

Unofficial Copy Office of Chris Daniel District Clerk

ACKNOWLEDGMENT
OPERATOR:

STATE OF ~~TEXAS~~ LOUISIANA
~~COUNTY~~ OF ~~HARRIS~~
PARISH OF LAFAYETTE

On this 21st day of October, 1999 before me appeared Charles T. Goodson, to me personally known, who, being by me duly sworn, did say that he is the President and Chief Executive Officer of PetroQuest Energy One, L.L.C. and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.

Notary Public

My Commission Expires at death

ACKNOWLEDGMENTS
Non-Operator:

STATE OF LOUISIANA
COUNTY OF JEFFERSON

BEFORE ME, the undersigned authority, on this day personally appeared Harold N. Gariç, Treasurer for LLOG Exploration & Production Company., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated, on behalf of said corporation.

GIVEN under my hand and seal of office this 18th day of October, 1999 A.D.

My Commission Expires:

NOTARY PUBLIC

Unofficial Copy Office of Chris Daniel District Clerk

ATTACHMENT "1" TO EXHIBIT "G"

Attached to and made a part of the Memorandum of Operating Agreement and Financing Statement (Texas) dated effective ________, 19____, by and between PetroQuest Energy One, L.L.C. and LLOG Exploration & Production Company

I. DESCRIPTION OF LANDS AND LEASES WITHIN THE CONTRACT AREA

| OCS-G | Area | Block | Dated |
|---|---|---|---|
| 14427 | Vermilion Area, South Addition | 375 | 5/1/94 |
| 14428 | Vermilion Area, South Addition | 376 | 5/1/94 |

II. OPERATOR

**PetroQuest Energy One, L.L.C.**

III. PARTIES, REPRESENTATIVES, ADDRESSES, AND INTERESTS CONTRIBUTED

**PetroQuest Energy One, L.L.C.** **50%**
**10333 Richmond Ave., Suite 710**
**Houston, Texas 77042**
**Representative: Mr. V.J. Luszcz**
**Telephone: 713-784-8300**
**Facsimile: 713-784-8327**

**LLOG Exploration & Production Company** **50%**
**433 Metairie Road, Suite 600**
**Metairie, Louisiana 70005**
**Attn: Gerry Whitman**
**Telephone No. 504-833-7700**
**Telecopy No. 504-828-5276**

Unofficial Copy Office of Chris Daniel District Clerk

ATTACHMENT "D"
VERMILION BLOCK 376 WELL 2 COST ESTIMATE

| | DESCRIPTION | | 100% COST | LLOG'S % | | LLOG'S INVESTMENT |
|---|---|---|---|---|---|---|
| 1 | TURNKEY DRILL & LOG WITH LWD TO 4550' TVD TO EVALUATE "Q" & "S" SANDS | $ | 1,808,292 | 66.67% | $ | 1,205,528 |
| 2 | TURNKEY DRILL & LOG WITH LWD TO 5900' TVD TO EVALUATE "T" SANDS | $ | 2,689,000 | 66.67% | $ | 1,792,667 |
| 3 | TURNKEY OPTIONAL LOGGING (AIT QUAD COMBO & SWCS) | $ | 207,000 | 50.00% | $ | 103,500 |
| 4 | TOTAL TURNKEY DRILL & EVALUATE to PTD WITH WIRELINE LOGS & SIDEWALL CORES | $ | 2,896,000 | | $ | 1,896,167 |
| 5 | TURNKEY P&A | $ | 204,000 | 50.00% | $ | 102,000 |
| | TOTAL TURNKEY COST TO DRILL, EVALUATE & P&A | $ | 3,100,000 | | $ | 1,998,167 |

Unofficial Copy Office of Chris Daniel District Clerk

# EXHIBIT "C"

Unofficial Copy Office of Chris Daniel District Clerk

## ASSIGNMENT OF RECORD TITLE INTEREST AND OPERATING RIGHTS

UNITED STATES OF AMERICA §
§ KNOW ALL MEN BY THESE PRESENTS:
OUTER CONTINENTAL SHELF §

**Implicit Oil & Gas (VR 376), LLC.**, a Delaware limited liability company whose address is 8080 N. Central Expy., Suite 1250, Dallas, Texas 75206 ("Assignor"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and full acquittance granted therefore, has granted, sold, assigned, conveyed and delivered, and does hereby grant, sell, assign, convey and deliver, unto **Texas OG Acquisitions, LLC**, a Texas limited liability company, whose address is 4514 Cole Ave., Suite 600, Dallas, TX 75205 ("Assignee"), all of its right, title and interest in and to the Record Title Interest (being an undivided twenty-five percent (25%) working interest) in and to the OCS-G 14428 Vermilion Area, South Addition, **Block 376 #A-3 wellbore**, appurtenances thereto and hydrocarbons produced therefrom located on the following described oil and gas lease (collectively, the "**Interests**"):

> Oil and Gas Lease effective May 1, 1994, bearing Serial No. OCS-G 14428, between the United States of America, as Lessor, and Phillips Petroleum Company and Anadarko Petroleum Corporation, as Lessee, covering all of Block 376, South Addition, OCS Leasing Map, Louisiana Map No. 3B, INSOFAR AND ONLY INSOFAR from subsea surface to 9,000' TVD, recorded at Entry #20012745 in the Conveyance Records of Vermilion Parish, Louisiana. (the "***Lease***");

Assignor shall be entitled to all proceeds of hydrocarbons produced prior to the Effective Time and attributable to the Interests herein conveyed by Assignor; Assignee shall be entitled to all proceeds of hydrocarbons produced after the Effective Time and attributable to the Interests herein conveyed by Assignor.

TO HAVE AND TO HOLD, the Interests unto Assignee, its successors and assigns, forever, pursuant to and subject to all of the terms and conditions as set forth in this Assignment.

THIS ASSIGNMENT IS EXECUTED BY ASSIGNOR WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS, IMPLIED, OR STATUTORY; PROVIDED, HOWEVER, ASSIGNOR SPECIALLY WARRANTS AND DEFENDS TITLE TO THE INTERESTS AS SET FORTH HEREIN AGAINST THE LAWFUL CLAIMS, LIENS, ENCUMBRANCES AND DEMANDS OF ALL PERSONS OR ENTITIES CLAIMING THE SAME OR ANY PART THEREOF BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE; PROVIDED ASSIGNEE SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY THAT ASSIGNOR HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OF THE INTERESTS.

This Assignment of Record Title Interest and Operating Rights is executed in multiple originals effective as of September 14, 2012, 7:00 a.m. Central Standard Time ("Effective Time").

EXHIBIT 7

Unofficial Copy Office of Chris Daniel District Clerk

STATE OF TEXAS §
Dallas §
COUNTY OF ~~MONTGOMERY~~ §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Edmond Boutte, President, Energy Division of B/K Funds GP, LLC, sole manager of Implicit Oil & Gas (VR 376), LLC to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:

5/3/14

STATE OF TEXAS §

COUNTY OF DALLAS §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Ron Beneke, CEO of Texas OG Acquisitions, LLC, to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:

5/3/14

Unofficial Copy Office of Chris Daniel District Clerk

**ASSIGNOR:**

**Implicit Oil & Gas (VR 376), LLC**

WITNESSES:

Michael J Ward

Tae Kim

By: B/K Funds GP, LLC

By: ____________________
Ed Boutte
President, Energy Division

**ASSIGNEE:**

**TEXAS OG ACQUISITIONS, LLC**

WITNESSES:

Michael W Ward

Tae Kim

By: Implicit Solutions GP, LLC

By: ____________________
Ron Beneke
CEO

Unofficial Copy Office of Chris Daniel District Clerk

Seal of the Clerk of Court, State of Louisiana, The Parish of Vermilion

Vermilion Parish Louisiana
I certify that this is a true copy of the original filing that was Recorded on 9/19/2012 at 12:29 PM in CO # 2012008870
Deputy Clerk

**ASSIGNMENT OF RECORD TITLE INTEREST AND OPERATING RIGHTS**

**UNITED STATES OF AMERICA** §
§ **KNOW ALL MEN BY THESE PRESENTS:**
**OUTER CONTINENTAL SHELF** §

**Implicit Oil & Gas (VR 376), LLC.**, a Delaware limited liability company whose address is 8080 N. Central Expy., Suite 1250, Dallas, Texas 75206 ("**Assignor**"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and full acquittance granted therefore, has granted, sold, assigned, conveyed and delivered, and does hereby grant, sell, assign, convey and deliver, unto **Texas OG Acquisitions, LLC**, a Texas limited liability company, whose address is 4514 Cole Ave., Suite 600, Dallas, TX 75205 ("**Assignee**"), all of its right, title and interest in and to the Record Title Interest (being an undivided twenty-five percent (25%) working interest) in and to the OCS-G 14428 Vermilion Area, South Addition, **Block 376 #A-4 wellbore**, appurtenances thereto and hydrocarbons produced therefrom located on the following described oil and gas lease (collectively, the "**Interests**"):

> Oil and Gas Lease effective May 1, 1994, bearing Serial No. OCS-G 14428, between the United States of America, as Lessor, and Phillips Petroleum Company and Anadarko Petroleum Corporation, as Lessee, covering all of Block 376, South Addition, OCS Leasing Map, Louisiana Map No. 3B, INSOFAR AND ONLY INSOFAR from subsea surface to 9,000' TVD, recorded at Entry #20012745 in the Conveyance Records of Vermilion Parish, Louisiana. (the "***Lease***");

Assignor shall be entitled to all proceeds of hydrocarbons produced prior to the Effective Time and attributable to the Interests herein conveyed by Assignor; Assignee shall be entitled to all proceeds of hydrocarbons produced after the Effective Time and attributable to the Interests herein conveyed by Assignor.

TO HAVE AND TO HOLD, the Interests unto Assignee, its successors and assigns, forever, pursuant to and subject to all of the terms and conditions as set forth in this Assignment.

THIS ASSIGNMENT IS EXECUTED BY ASSIGNOR WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS, IMPLIED, OR STATUTORY; PROVIDED, HOWEVER, ASSIGNOR SPECIALLY WARRANTS AND DEFENDS TITLE TO THE INTERESTS AS SET FORTH HEREIN AGAINST THE LAWFUL CLAIMS, LIENS, ENCUMBRANCES AND DEMANDS OF ALL PERSONS OR ENTITIES CLAIMING THE SAME OR ANY PART THEREOF BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE; PROVIDED ASSIGNEE SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY THAT ASSIGNOR HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OF THE INTERESTS.

This Assignment of Record Title Interest and Operating Rights is executed in multiple originals effective as of September 14, 2012, 7:00 a.m. Central Standard Time ("**Effective Time**").

Unofficial Copy Office of Chris Daniel District Clerk

**ASSIGNMENT OF RECORD TITLE INTEREST AND OPERATING RIGHTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **KNOW ALL MEN BY THESE PRESENTS:** |
| **OUTER CONTINENTAL SHELF** | § | |

Official Copy Office of Danise Clerk

**Implicit Oil & Gas (VR 376), LLC.**, a Delaware limited liability company whose address is 8080 N. Central Expy., Suite 1250, Dallas, Texas 75206 ("**Assignor**"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and full acquittance granted therefore, has granted, sold, assigned, conveyed and delivered, and does hereby grant, sell, assign, convey and deliver, unto **Texas OG Acquisitions, LLC**, a Texas limited liability company, whose address is 4514 Cole Ave., Suite 600, Dallas, TX 75205 ("**Assignee**"), all of its right, title and interest in and to the Record Title Interest (being an undivided twenty-five percent (25%) working interest) in and to the OCS-G 14428 Vermilion Area, South Addition, **Block 376 #A-4 wellbore**, appurtenances thereto and hydrocarbons produced therefrom located on the following described oil and gas lease (collectively, the "**Interests**"):

> Oil and Gas Lease effective May 1, 1994, bearing Serial No. OCS-G 14428, between the United States of America, as Lessor, and Phillips Petroleum Company and Anadarko Petroleum Corporation, as Lessee, covering all of Block 376, South Addition, OCS Leasing Map, Louisiana Map No. 3B, INSOFAR AND ONLY INSOFAR from subsea surface to 9,000' TVD, recorded at Entry #20012745 in the Conveyance Records of Vermilion Parish, Louisiana. (the "***Lease***");

Assignor shall be entitled to all proceeds of hydrocarbons produced prior to the Effective Time and attributable to the Interests herein conveyed by Assignor; Assignee shall be entitled to all proceeds of hydrocarbons produced after the Effective Time and attributable to the Interests herein conveyed by Assignor.

TO HAVE AND TO HOLD, the Interests unto Assignee, its successors and assigns, forever, pursuant to and subject to all of the terms and conditions as set forth in this Assignment.

THIS ASSIGNMENT IS EXECUTED BY ASSIGNOR WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS, IMPLIED, OR STATUTORY; PROVIDED, HOWEVER, ASSIGNOR SPECIALLY WARRANTS AND DEFENDS TITLE TO THE INTERESTS AS SET FORTH HEREIN AGAINST THE LAWFUL CLAIMS, LIENS, ENCUMBRANCES AND DEMANDS OF ALL PERSONS OR ENTITIES CLAIMING THE SAME OR ANY PART THEREOF BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE; PROVIDED ASSIGNEE SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY THAT ASSIGNOR HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OF THE INTERESTS.

This Assignment of Record Title Interest and Operating Rights is executed in multiple originals effective as of September 14, 2012, 7:00 a.m. Central Standard Time ("**Effective Time**").

**ASSIGNOR:**

**Implicit Oil & Gas (VR 376), LLC**

WITNESSES:

Michael W Ward

Tae Kim

By: B/K Funds GP, LLC

By: Ed Boutte
Ed Boutte
President, Energy Division

**ASSIGNEE:**

**TEXAS OG ACQUISITIONS, LLC**

WITNESSES:

Michael W Ward

Tae Kim

By: Implicit Solutions GP, LLC

By: ________________
Ron Beneke
CEO

Unofficial Copy Office of Chris Daniel District Clerk

Vermilion Parish Louisiana
Diane Meaux Sherwood
I certify that this is a true copy of the original filing that was Recorded on 9/19/2012 at 12:29 PM in CO # 2012008871
Deputy Clerk

SLATTERY
MARINO &
ROBERTS

Gerald F. Slattery, Jr.
Anthony C. Marino
Paul J. Goodwine
David S. Landry
Herman E. Garner, Jr.
Lynn G. Witt
Kathleen E. Doody
Colleen Darr Jarrott
Emile J. Dreuil, III
Nadine A. Abbate
Jefferson R. Goldman
Holly Dechipinti Thompson
Taylor P. Mouledoux
April Daniels Arvidson
Nelson Roberts (1956-2009)

September 18, 2012

Ms. Colette Worcester
Bureau of Ocean Energy Management
Adjudication Unit
1201 Elmwood Park Boulevard, MS 5421
New Orleans, Louisiana 70123-2390

Re: Assignment of Record Title Interest and Operating Rights (Vermilion Area, Block 376 A-3 wellbore)
Our File No. 8124.3223

Ladies and Gentlemen:

Enclosed please find two (2) copies of an Assignment of Record Title Interest and Operating Rights affecting OCS-G 14428, Vermilion Area, Block 376 #A-3 wellbore, (hereinafter referred to as "Assignment") by Implicit Oil & Gas (VR 376), LLC, as Assignor and Texas OG Acquisitions, LLC, as Assignee. We submit to the BOEM for "filing purposes only" the Assignment. Please record this letter and the Assignment in the files maintained for OCS-G 14428. This letter and document should be placed on your document imaging system under "Document Type No. 7" described as "Contracts, Agreements, and Conveyances." I have enclosed a paygov receipt for filing fees in the amount of $27.00.

If you have any questions concerning this matter, please do not hesitate to contact the undersigned at 504-585-7800.

Very truly yours,

Joan G. Seelman
Legal Assistant

Enclosures

cc: Kathleen Doody (w/enclosures)

017.8193a.3223.ltmonreqassignment

Unofficial Copy Office of Chris Daniel District Clerk

RECEIVED
SEP 19 2012
ADJUDICATION SECTION

**ASSIGNMENT OF RECORD TITLE INTEREST AND OPERATING RIGHTS**

**UNITED STATES OF AMERICA** §
§ **KNOW ALL MEN BY THESE PRESENTS:**
**OUTER CONTINENTAL SHELF** §

**Implicit Oil & Gas (VR 376), LLC.**, a Delaware limited liability company whose address is 8080 N. Central Expy., Suite 1250, Dallas, Texas 75206 ("**Assignor**"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and full acquittance granted therefore, has granted, sold, assigned, conveyed and delivered, and does hereby grant, sell, assign, convey and deliver, unto **Texas OG Acquisitions, LLC**, a Texas limited liability company, whose address is 4514 Cole Ave., Suite 600, Dallas, TX 75205 ("**Assignee**"), all of its right, title and interest in and to the Record Title Interest (being an undivided twenty-five percent (25%) working interest) in and to the OCS-G 14428 Vermilion Area, South Addition, **Block 376 #A-3 wellbore**, appurtenances thereto and hydrocarbons produced therefrom located on the following described oil and gas lease (collectively, the "**Interests**"):

> Oil and Gas Lease effective May 1, 1994, bearing Serial No. OCS-G 14428, between the United States of America, as Lessor, and Phillips Petroleum Company and Anadarko Petroleum Corporation, as Lessee, covering all of Block 376, South Addition, OCS Leasing Map, Louisiana Map No. 3B, INSOFAR AND ONLY INSOFAR from subsea surface to 9,000' TVD, recorded at Entry #20012745 in the Conveyance Records of Vermilion Parish, Louisiana. (the "***Lease***");

Assignor shall be entitled to all proceeds of hydrocarbons produced prior to the Effective Time and attributable to the Interests herein conveyed by Assignor; Assignee shall be entitled to all proceeds of hydrocarbons produced after the Effective Time and attributable to the Interests herein conveyed by Assignor.

TO HAVE AND TO HOLD, the Interests unto Assignee, its successors and assigns, forever, pursuant to and subject to all of the terms and conditions as set forth in this Assignment.

THIS ASSIGNMENT IS EXECUTED BY ASSIGNOR WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS, IMPLIED, OR STATUTORY; PROVIDED, HOWEVER, ASSIGNOR SPECIALLY WARRANTS AND DEFENDS TITLE TO THE INTERESTS AS SET FORTH HEREIN AGAINST THE LAWFUL CLAIMS, LIENS, ENCUMBRANCES AND DEMANDS OF ALL PERSONS OR ENTITIES CLAIMING THE SAME OR ANY PART THEREOF BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE; PROVIDED ASSIGNEE SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY THAT ASSIGNOR HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OF THE INTERESTS.

This Assignment of Record Title Interest and Operating Rights is executed in multiple originals effective as of September 14, 2012, 7:00 a.m. Central Standard Time ("**Effective Time**").

Official Copy Office of Chris Daniel District Clerk

STATE OF TEXAS §
§
COUNTY OF ~~MONTGOMERY~~ DALLAS §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Edmond Boutte, President, Energy Division of B/K Funds GP, LLC, sole manager of Implicit Oil & Gas (VR 376), LLC to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:

05/03/14

STATE OF TEXAS §
§
COUNTY OF DALLAS §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Ron Beneke, CEO of Texas OG Acquisitions, LLC, to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:

5/3/14

Unofficial Copy Office of Chris Daniel District Clerk

**ASSIGNOR:**

**Implicit Oil & Gas (VR 376), LLC**

WITNESSES:

Michael W. Ward

Tae Kim

By: B/K Funds GP, LLC

By: ______________________
Ed Boutte
President, Energy Division

**ASSIGNEE:**

**TEXAS OG ACQUISITIONS, LLC**

WITNESSES:

Michael W. Ward

Tae Kim

By: Implicit Solutions GP, LLC

By: ______________________
Ron Beneke
CEO

Unofficial Copy Office of Chris Daniel District Clerk

SLATTERY
MARINO &
ROBERTS

Gerald J. Slattery, Jr.
Anthony D. Marino
Paul J. Goodwine
David S. Landry
Herman C. Hoffmann, Jr.
Lynn E. Witt
Kathleen L. Doody
Colleen Carr Jarrott
Emile J. Dreuil, III
Nadège A. Assalé
Jefferson B. Goldman
Molly Ecchipinti Thompson
Taylor P. Mouledoux
Aurie Dando Arvidson

Neelis Roberts
(1956-2009)

September 18, 2012

Ms. Colette Worcester
Bureau of Ocean Energy Management
Adjudication Unit
1201 Elmwood Park Boulevard, MS 5421
New Orleans, Louisiana 70123-2390

Re: Assignment of Record Title Interest and Operating Rights (Vermilion Area, Block 376 A-4 wellbore)
Our File No. 8124.3223

Ladies and Gentlemen:

Enclosed please find two (2) copies of an Assignment of Record Title Interest and Operating Rights affecting OCS-G 14428, Vermilion Area, Block 376 #A-4 wellbore, (hereinafter referred to as "Assignment") by Implicit Oil & Gas (VR 376), LLC, as Assignor and Texas OG Acquisitions, LLC, as Assignee. We submit to the BOEM for **"filing purposes only"** the Assignment. Please record this letter and the Assignment in the files maintained for OCS-G 14428. This letter and document should be placed on your document imaging system under "Document Type No. 7" described as "Contracts, Agreements, and Conveyances." I have enclosed a paygov receipt for filing fees in the amount of $27.00.

If you have any questions concerning this matter, please do not hesitate to contact the undersigned at 504-585-7800.

Very truly yours,

Joan G. Seelman

Joan G. Seelman
Legal Assistant

Enclosures

cc: Kathleen Doody (w/enclosures)

017.8194a.3223.ltrnonreq

Unofficial Copy Office of Chris Daniel District Clerk

RECEIVED SEP 19 2012 ADJUDICATION SECTION

**ASSIGNMENT OF RECORD TITLE INTEREST AND OPERATING RIGHTS**

UNITED STATES OF AMERICA §
§ KNOW ALL MEN BY THESE PRESENTS:
OUTER CONTINENTAL SHELF §

**Implicit Oil & Gas (VR 376), LLC.**, a Delaware limited liability company whose address is 8080 N. Central Expy., Suite 1250, Dallas, Texas 75206 ("Assignor"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and full acquittance granted therefore, has granted, sold, assigned, conveyed and delivered, and does hereby grant, sell, assign, convey and deliver, unto **Texas OG Acquisitions, LLC**, a Texas limited liability company, whose address is 4514 Cole Ave., Suite 600, Dallas, TX 75205 ("**Assignee**"), all of its right, title and interest in and to the Record Title Interest (being an undivided twenty-five percent (25%) working interest) in and to the OCS-G 14428 Vermilion Area, South Addition, **Block 376** #A-4 wellbore, appurtenances thereto and hydrocarbons produced therefrom located on the following described oil and gas lease (collectively, the "**Interests**"):

> Oil and Gas Lease effective May 1, 1994, bearing Serial No. OCS-G 14428, between the United States of America, as Lessor, and Phillips Petroleum Company and Anadarko Petroleum Corporation, as Lessee, covering all of Block 376, South Addition, OCS Leasing Map, Louisiana Map No. 3B, INSOFAR AND ONLY INSOFAR from subsea surface to 9,000' TVD, recorded at Entry #20012745 in the Conveyance Records of Vermilion Parish, Louisiana. (the "***Lease***");

Assignor shall be entitled to all proceeds of hydrocarbons produced prior to the Effective Time and attributable to the Interests herein conveyed by Assignor; Assignee shall be entitled to all proceeds of hydrocarbons produced after the Effective Time and attributable to the Interests herein conveyed by Assignor.

TO HAVE AND TO HOLD, the Interests unto Assignee, its successors and assigns, forever, pursuant to and subject to all of the terms and conditions as set forth in this Assignment.

THIS ASSIGNMENT IS EXECUTED BY ASSIGNOR WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS, IMPLIED, OR STATUTORY; PROVIDED, HOWEVER, ASSIGNOR SPECIALLY WARRANTS AND DEFENDS TITLE TO THE INTERESTS AS SET FORTH HEREIN AGAINST THE LAWFUL CLAIMS, LIENS, ENCUMBRANCES AND DEMANDS OF ALL PERSONS OR ENTITIES CLAIMING THE SAME OR ANY PART THEREOF BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE; PROVIDED ASSIGNEE SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY THAT ASSIGNOR HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OF THE INTERESTS.

This Assignment of Record Title Interest and Operating Rights is executed in multiple originals effective as of September 14, 2012, 7:00 a.m. Central Standard Time ("**Effective Time**").

Official Copy Office of Chris Daniel District Clerk

**STATE OF TEXAS** §
§
**COUNTY OF ~~MONTGOMERY~~** DALLAS §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Edmond Boutte, President, Energy Division of B/K Funds GP, LLC, sole manager of Implicit Oil & Gas (VR 376), LLC to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:
5/3/14

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

**STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

Be it known, that on this 17 day of September, 2012, before me the undersigned, personally came and appeared Ron Beneke, CEO of Texas OG Acquisitions, LLC, to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses, whose names are thereto subscribed as such being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF, the said appearer has signed these presents and I have hereunto affixed my hand and seal; together with the said witnesses on the day and date first above written.

Christi R. Glasscock
Notary Public in and for the State of Texas

My Commission Expires:
5/3/14

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
May 03, 2014

Unofficial Copy Office of Chris Daniel District Clerk

**ASSIGNOR:**

**Implicit Oil & Gas (VR 376), LLC**

WITNESSES:

Michael W Ward

Tae Kim

By: B/K Funds GP, LLC

By: ______________________
Ed Boutte
President, Energy Division

**ASSIGNEE:**

**TEXAS OG ACQUISITIONS, LLC**

WITNESSES:

Michael W Ward

Tae Kim

By: Implicit Solutions GP, LLC

By: ______________________
Ron Beneke
CEO

Unofficial Copy Office of Chris Daniel District Clerk

CONFIRMED FILE DATE: 3/28/2013

BAKER DONELSON
BEARMAN, CALDWELL & BERKOWITZ, PC

1301 MCKINNEY STREET
SUITE 3700
HOUSTON, TEXAS 77010

PHONE: 713.650.9700
FAX: 713.650.9701

www.bakerdonelson.com

March 27, 2013

**Via Hand Delivery**

Harris County District Clerk
201 Caroline Street, Civil Intake
Houston, Texas 77002

Re: Case No. 2013-17984; *Rooster Oil & Gas, LLC and Rooster Petroleum, LLC vs. Birnham Energy Investment Company, LP f/k/a Implicit Oil & Gas LP and Implicit Oil & Gas, (VR 376), LLC;* In the 165th Judicial District Court of Harris County, Texas.

Dear Clerk:

Enclosed are three service copies of Plaintiffs' Original Petition that was filed today. These copies are to be attached to the citations. Once the citations have been issued, please contact me for pick up.

Thank you for your help and if you have any questions in regard to this matter, please feel free to contact me.

Sincerely,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

[signature]

Amy Rainwater, TBLS, PHP
Paralegal

Enclosure

Unofficial Copy Office of Chris Daniel District Clerk

FILED
Chris Daniel
District Clerk
MAR 28 2013
Time: ____
By ____ Harris County, Texas
Deputy

KPS01 740521 v1
2909093-000004 03/27/2013

Filed 13 March 27 A11:16
Chris Daniel - District Clerk
Harris County
ED101J017398696
By: Sharon Carlton

2013-17984 / Court: 165

CIVIL PROCESS REQUEST

FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING
FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED

CASE NUMBER: ______ CURRENT COURT: ______

TYPE OF INSTRUMENT TO BE SERVED (See Reverse For Types): Plaintiffs' Original Petition

FILE DATE OF MOTION: 03/26/13
Month/ Day/ Year

SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):

1. NAME: Birnham Energy Investment Company, L.P. fka Implicit Oil & Gas, LP
ADDRESS: 8080 N. Central Expressway, Suite 1250, Dallas, TX 75206
AGENT, (*if applicable*): Ron Beneke
TYPE OF SERVICE/PROCESS TO BE ISSUED (*see reverse for specific type*): Citation

SERVICE BY (*check one*):
- ☑ ATTORNEY PICK-UP
- ☐ CONSTABLE
- ☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: ______ Phone: ______
- ☐ MAIL
- ☐ CERTIFIED MAIL
- ☐ PUBLICATION:
  Type of Publication: ☐ COURTHOUSE DOOR, or ☐ NEWSPAPER OF YOUR CHOICE: ______
- ☐ OTHER, *explain* ______

****************************************************************************************

****

2. NAME: Implicit Oil & Gas, (VR 376), LLC
ADDRESS: Home office: 8080 N. Central Expy., Suite 1250, Dallas, TX 75206
AGENT, (*if applicable*): Texas Secretary of State, 8080 N. CentralExpw., Suite 1250, Dallas, TX 75206
TYPE OF SERVICE/PROCESS TO BE ISSUED (*see reverse for specific type*): Citation

SERVICE BY (*check one*):
- ☑ ATTORNEY PICK-UP
- ☐ CONSTABLE
- ☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: ______ Phone: ______
- ☐ MAIL
- ☐ CERTIFIED MAIL
- ☐ PUBLICATION:
  Type of Publication: ☐ COURTHOUSE DOOR, or ☐ NEWSPAPER OF YOUR CHOICE: ______
- ☐ OTHER, *explain* ______

ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:

NAME: Beatriz Richmond TEXAS BAR NO./ID NO. 13190400
MAILING ADDRESS: 1301 McKinney Street, Suite 3700, Houston, TX 77010
PHONE NUMBER: 713 (area code) 650-9700 (phone number) FAX NUMBER: 713 (area code) 650-9701 (fax number)
EMAIL ADDRESS: brichmond@bakerdonelson.com

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT A-3

SERVICE REQUESTS WHICH CANNOT BE PROCESSED BY THIS OFFICE WILL BE HELD FOR 30 DAYS PRIOR TO CANCELLATION. FEES WILL BE REFUNDED ONLY UPON REQUEST, OR AT THE DISPOSITION OF THE CASE. SERVICE REQUESTS MAY BE REINSTATED UPON APPROPRIATE ACTION BY THE PARTIES.

INSTRUMENTS TO BE SERVED:
(Fill In Instrument Sequence Number, i.e. 1st, 2nd, etc.)

ORIGINAL PETITION
_______ AMENDED PETITION
_______ SUPPLEMENTAL PETITION

COUNTERCLAIM
_______ AMENDED COUNTERCLAIM
_______ SUPPLEMENTAL COUNTERCLAIM

CROSS-ACTION:
_______ AMENDED CROSS-ACTION
_______ SUPPLEMENTAL CROSS-ACTION

THIRD-PARTY PETITION:
_______ AMENDED THIRD-PARTY PETITION
_______ SUPPLEMENTAL THIRD-PARTY PETITION

INTERVENTION:
_______ AMENDED INTERVENTION
_______ SUPPLEMENTAL INTERVENTION

INTERPLEADER
_______ AMENDED INTERPLEADER
_______ SUPPLEMENTAL INTERPLEADER

INJUNCTION

MOTION TO MODIFY

SHOW CAUSE ORDER

TEMPORARY RESTRAINING ORDER

BILL OF DISCOVERY:
ORDER TO: ______________________
(specify)

MOTION TO: ______________________
(specify)

PROCESS TYPES:

NON WRIT:
CITATION
ALIAS CITATION
PLURIES CITATION
SECRETARY OF STATE CITATION
COMMISSIONER OF INSURANCE
HIGHWAY COMMISSIONER
CITATION BY PUBLICATION
NOTICE
SHORT FORM NOTICE

PRECEPT (SHOW CAUSE)
RULE 106 SERVICE

SUBPOENA

WRITS:
ATTACHMENT (PROPERTY)
ATACHMENT (WITNESS)
ATTACHMENT (PERSON)

CERTIORARI

EXECUTION
EXECUTION AND ORDER OF SALE

GARNISHMENT BEFORE JUDGMENT
GARNISHMENT AFTER JUDGMENT

HABEAS CORPUS
INJUNCTION
TEMPORARY RESTRAINING ORDER

PROTECTIVE ORDER (FAMILY CODE)
PROTECTIVE ORDER (CIVIL CODE)

POSSESSION (PERSON)
POSSESSION (PROPERTY)

SCIRE FACIAS
SEQUESTRATION
SUPERSEDEAS

Unofficial Copy Office of Chris Daniel District Clerk

CONFIRMED FILE DATE: 4/2/2013

**CHRIS DANIEL**
**HARRIS COUNTY DISTRICT CLERK**

## CIVIL PROCESS PICK-UP FORM

CAUSE NUMBER: 2013 17984

ATY ✓ CIV ___ COURT 165

**REQUESTING ATTORNEY/FIRM NOTIFICATION**

Attorney: Beatriz Quintana Richmond Phone: 713 650 9700

Civil Process Server/Filer: Amy Rainwater Phone: " "

Attorney/Firm Notified Service Ready: left voicemail @ 11:57 Date: April 2, 2013

Contacted By: Nelson Cuero
Deputy District Clerk

30th day after date of Issuance 05-02-2013

| Type of Service Document: | Tracking number: |
|---|---|
| CITC | 72889660 |
| SECC | 72889661 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

The above process papers were prepared by: Nelson Cuero
Deputy District Clerk

On this the 2nd day of April 2013.

Process papers released to: [signature]

Process papers released by: ___

On this the 2 day of April, 2013 at 12:55 AM/PM

Unofficial Copy Office of Chris Daniel District Clerk

CONFIRMED FILE DATE: 4/11/2013

P.2

CAUSE NO. 201317984

RECEIPT NO. 457680 0.00 ATY
03-27-2013 TR # 72889661

PLAINTIFF: ROOSTER OIL & GAS LLC
vs.
DEFENDANT: BIRNHAM ENERGY INVESTMENT COMPANY L P (F/K/A IMPLI

In The 165th
Judicial District Court
of Harris County, Texas
165TH DISTRICT COURT
Houston, TX

CITATION (SECRETARY OF STATE FOREIGN CORPORATION)

THE STATE OF TEXAS
County of Harris

RECORDER'S MEMORANDUM This instrument is of poor quality at the time of imaging

TO: IMPLICIT OIL & GAS (VR 376) LLC (FOREIGN CORPORATION) MAY BE SERVED BY SERVING THE TEXAS SECRETARY OF STATE 1019 BRAZOS STREET AUSTIN TEXAS 78701
FORWARD TO DEFENDANT'S HOME OFFICE
8080 N CENTRAL EXPY SUITE 1250 DALLAS TX 75206

Attached is a copy of PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

This instrument was filed on the 27th day of March, 2013, in the above cited cause number and court. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED, You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were served this citation and petition, a default judgment may be taken against you.

TO OFFICER SERVING:
This citation was issued on 2nd day of April, 2013, under my hand and seal of said Court.

Issued at request of:
RICHMOND, BEATRIZ QUINTANA
1301 MCKINNEY STREET SUITE 3000
HOUSTON, TX 77010
Tel: (713) 650-9700
Bar No.: 24083734

(Seal: DISTRICT COURT OF HARRIS COUNTY, TEXAS)

CHRIS DANIEL, District Clerk
Harris County, Texas
201 Caroline Houston, Texas 77002
(P.O. Box 4651, Houston, Texas 77210)

GENERATED BY: CUERO, NELSON 7MM/YSW/9532573

FILED
Chris Daniel
District Clerk
APR 11 2013
Time: ___ Harris County, Texas
By ___ Deputy

Unofficial Copy Office of Chris Daniel District Clerk

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at 4:20 o'clock P .M., on the 2nd day of April, 2013.

Executed at (address) 1019 Brazos Street, Austin, TX 78701 in Travis County at 11:48 o'clock A .M., on the 8th day of April, 2013, by delivering to Implicit Oil & Gas (VR 376) LLC (Foreign Corporation) c/o The Texas Secretary of State defendant, ~~in person~~, BY CMRRR, a true copy of this Citation together with the accompanying 1 copy(ies) of the ~~Petition~~ Plaintiff's Original Petition & Request for Disclosure attached thereto ~~and I endorsed on said copy of the Citation the date of delivery~~.

To certify which I affix my hand officially this 11th day of April, 2013.

Fee: $________

______________________

______ of ____________ County, Texas

EXHIBIT A-4

English Customer Service USPS Mobile Register / Sign In

Search USPS.com or Track Pack

Quick Tools Ship a Package Send Mail Manage Your Mail Shop Business Solutions

# Track & Confirm

GET EMAIL UPDATES PRINT DETAILS

| YOUR LABEL NUMBER | SERVICE | STATUS OF YOUR ITEM | DATE & TIME | LOCATION | FEATURES |
|---|---|---|---|---|---|
| | Priority Mail® | Delivered | April 08, 2013, 11:48 am | AUSTIN, TX 78711 | Expected Delivery By: April 6, 2013 Certified Mail™ Return Receipt |
| | | Available for Pickup | April 06, 2013, 11:50 am | AUSTIN, TX 78711 | |
| | | Arrival at Unit | April 05, 2013, 4:41 am | AUSTIN, TX 78744 | |
| | | Dispatched to Sort Facility | April 03, 2013, 4:44 pm | HOUSTON, TX 77201 | |
| | | Acceptance | April 03, 2013, 1:44 pm | HOUSTON, TX 77201 | |

Unofficial Copy Office of Chris Daniel District Clerk

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

AUSTIN TX 78701 OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $6.60 | 0010 |
| Certified Fee | $3.10 | 23 |
| Return Receipt Fee (Endorsement Required) | $2.55 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | 2013 |
| Total Postage & Fees | $ $12.25 | 04/03/2013 |

Sent To Implicit Oil & Gas (VR376) LLC
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

PS Form 3800, August 2006 See Reverse for Instructions

7012 2920 0001 1366 6523

SECTION
. Also complete / is desired. ss on the reverse ard to you. k of the mailpiece, mits.

Implicit Oil & Gas (VR 376) LLC
c/o The Texas Secretary of State
1019 Brazos Street
Austin, TX 78701

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7012 2920 0001 1366 6523

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

Filed 13 April 17 A9:25
Chris Daniel - District Clerk
Harris County
ED101J017435129
By: anita perez

KELSOE, KHOURY, ROGERS, CAUGHFIELD & CLARK, PC
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS
5323 SPRING VALLEY ROAD, SUITE 350
DALLAS, TEXAS 75254

STEPHEN A. KHOURY
Associate, American Board of Trial Advocates

PHONE: 972-661-2227
FAX: 972-233-4971
EMAIL: sakhoury@kelsoe-law.com

April 16, 2013

**Via Facsimile (713) 650-9701**

Mark Mathews
1301 McKinney St., Ste 3700
Houston, Texas 77010

RE: Rooster Oil & Gas, LLC, et al v. Birnham Energy Investment Company, L.P.
Cause No. 2013-17984

Dear Mr. Mathews:

This letter shall serve as our Rule 11 agreement pertaining to the matters contained herein.

We have agreed to the following:

1. I will accept service for Defendant Birnham Energy Investment Company, L.P. f/k/a Implicit Oil & Gas, L.P. and that you will have your process server serve me at my office; and

2. The answer date for both Defendants Birnham Energy Investment Company, L.P. f/k/a Implicit Oil & Gas, L.P. and Implicit Oil & Gas (VR376), LLC shall be Monday, May 6, 2013.

If this letter correctly reflects our agreement, please sign in the space provided below and fax back to me at your earliest convenience.

Sincerely yours,

STEPHEN A. KHOURY

SAK:ab

Agreed:

Mark Mathews

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT A-5

Filed 13 May 3 P2:54
Chris Daniel - District Clerk
Harris County
ED101J017466867
By: anita perez

Cause No. 2013-17984

| | | |
|---|---|---|
| ROOSTER OIL & GAS, LLC and ROOSTER PETROLEUM, LLC, | | IN THE DISTRICT COURT |
| Plaintiffs, | | |
| v. | | OF HARRIS COUNTY, TEXAS |
| BIRNHAM ENERGY INVESTMENT COMPANY, L.P. (f/k/a Implicit Oil & Gas, L.P.) and IMPLICIT OIL & GAS (VR 376), LLC, | | |
| Defendants | | 165TH JUDICIAL DISTRICT |

Unofficial Copy Office of Chris Daniel District Clerk

**DEFENDANTS' ORIGINAL ANSWER**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants Birnham Energy Investment Company, L.P. (f/k/a Implicit Oil & Gas, L.P. ("Birnham") and Implicit Oil & Gas (VR 376), LLC ("Implicit 376"), submit their Original Answer to Plaintiffs' Original Petition as follows:

**General Denial**

1. Defendants deny generally, each and every, all and singular, the allegations contained in Plaintiffs' Original Petition and demand strict proof thereof by a preponderance of the credible evidence.

**Sworn Denials**

2. Defendants deny that Plaintiff Rooster Petroleum, LLC ("Rooster Petroleum") is entitled to recover in the capacity in which it has sued or in any capacity. Specifically, Defendants assert that there is no privity of contract nor is there any agreement by and between Rooster Petroleum and Defendants, or either

EXHIBIT A-6

of them, that would entitle Rooster Petroleum to recover any amounts against Defendants.

3. Defendants deny that Defendant Birnham is liable under the applicable agreements to Plaintiffs. Specifically, as admitted by Plaintiffs in their Original Petition, Plaintiff consented to the assignment of the Participation Agreement by Birnham to Implicit 376. Pursuant to section 21 of the Participation Agreement, because Plaintiff consented to the assignment, Birnham cannot be held liable for any of the claims asserted by Plaintiff in this cause.

**Affirmative Defenses**

4. Without waiver of any other matter pled herein, Defendants assert that they are entitled to an offset against any amounts alleged to be owed in the amount of all production proceeds due under the Participation Agreement and the Operating Agreement, which amounts have been wrongfully taken by Plaintiffs, which amount totals at least the amount of damages sought by Plaintiffs in this case.

**THEREFORE**, Defendants request that Plaintiffs take nothing by their suit, that Defendants recover their costs, reasonable attorney's fees and for such other and further relief at law or in equity, to which Defendants may be justly entitled.

Unofficial Copy Office of Chris Daniel District Clerk

Respectfully submitted,

KELSOE, KHOURY, ROGERS,
CAUGHFIELD & CLARK, P.C.

By: /s/ Stephen A. Khoury
STEPHEN A. KHOURY - 11377500
5323 Spring Valley Rd., Suite 350
Dallas, Texas 75254
Telephone: (972) 661-2227
Facsimile: (972) 233-4971

ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

This is to certify that on this May 3, 2013, a true and correct copy of the foregoing Defendants' Original Answer was served upon Plaintiffs' counsel of record via fax.

/s/ Stephen A. Khoury
STEPHEN A. KHOURY

Unofficial Copy Office of Chris Daniel District Clerk

STATE OF TEXAS §
§
§
COUNTY OF DALLAS §

VERIFICATION

**BEFORE ME**, the undersigned authority, on this day personally appeared **RON BENEKE** who, upon being duly sworn, upon his oath, deposed and said that his is an authorized representative of Defendants Birnham Energy Investment Company, L.P. and Implicit Oil & Gas (VR 376), LLC, that he has read the foregoing Defendants' Original Answer and that the matters and allegations contained in numbered paragraphs 2 and 3 are within his personal knowledge and are true and correct.

Ron Beneke

**SUBSCRIBED AND SWORN** to before me the undersigned notary, on this the 3rd day of May 2013.

CHRISTI R. GLASSCOCK
Notary Public, State of Texas
My Commission Expires
05, 03, 2014

Notary public in and for
the State of Texas

Christi R Glasscock
Notary's printed name

05/03/14
My commission expires

Unofficial Copy Office of Chris Daniel District Clerk