40. Neither the Operating Agreement nor the Gas Balancing Agreement, however, supports Counter-Defendants' Gas Balancing Justification.

41. First, the Gas Balancing Agreement not only does not permit an imbalance with respect to condensate (liquid) production; it expressly prohibits it. The only term of the Gas Balancing Agreement relating to condensate is contained in section 10, which provides: "[e]ach party shall share in and own the condensate recovered at the wellhead in accordance with its Working Interest in such well as provided in the Operating Agreement." *See*, Gas Balancing Agreement attached as Exhibit H, p. 2.

42. As a result, Counter-Defendants cannot create an artificial "imbalance" of condensate to cover up its criminal theft of Counter-Plaintiffs' condensate portion of the Ongoing Production.

43. Counter-Defendants' use of the Gas Balancing Agreement is equally unavailing with respect to the gas. Article 21.5 of the Operating Agreement controls when the Gas Balancing Agreement is used with respect to gas production. Under article 21.5, the Gas Balance Agreement only applies "in the event separate disposition of gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it...." Ex. B, p. 42.

44. As such, a condition to the application of the Gas Balancing Agreement for gas is that there is a separate disposition of gas that causes one of the two enumerated situations. Because all of the gas is sold to the same purchaser, Counter-Defendants cannot use the gas balancing agreement as a means of covering

up its criminal theft of Counter-Plaintiffs' share of gas.

45. Further, even if conditions existed warranting the implementation of the Gas Balancing Agreement, the facts still preclude Defendant from using the agreement as part of its plan to force Counter-Plaintiffs to suffer *"a very long, difficult and costly time"* obtaining its minerals. Specifically, Counter-Defendants deprived Counter-Plaintiffs of access to its minerals and to an accounting such that it was impossible for Counter-Defendants to sell any minerals. Counter-Defendants' cannot use their own disruptive conduct to advance the argument that Counter-Plaintiffs have failed to designate the manner in which it was taking its minerals. Further, in order for Counter-Defendants to take advantage of the Gas Balancing Agreement and allege an imbalance, they are expressly required to account to Counter-Defendants for any alleged imbalance [Ex. H, section 8], something Counter-Defendants have repeatedly refused to provide, nor have Counter-Defendants attempted to remedy any such imbalance situation pursuant to the Gas Balancing Agreement.

46. The total amount of Counter-Plaintiffs' share of the Ongoing Production exceeds any and all amounts allegedly due and owing Counter-Defendants and continues to accrue at a rate of approximately $250,000 per month.

### The Counter-Defendants

47. Counter-Defendants Rooster OG and Rooster Petroleum are affiliate companies that are both 100% owned and controlled by Counter-Defendant Rooster LLC.

48. Counter-Defendant Rooster LLC is 100% owned and controlled by

Counter-Defendant Rooster Ltd, a publicly traded Canadian limited partnership.

49. From all information known at this time, it appears that Counter-Defendant Rooster Petroleum is used to nominally operate the various oil and gas properties and Counter-Defendant Rooster OG is used to nominally own the oil and gas properties.

50. Although Rooster Petroleum and Rooster OG may nominally operate and own the interests in some circumstances, the distinction between the two entities is for all intents and purposes has been ignored by the two entities.

51. In its public filings, Counter-Defendant Rooster Ltd demonstrates its disregard of the separateness of the entities throughout. By way of illustration, with respect to VR 376, Rooster Ltd stated the following:

- Acquisitions – In addition to its acquisition of Probe Resources, Ltd., Rooster [defined exclusively as Rooster Energy, Ltd] consolidated *its* working interest in Vermilion 376 by acquiring its partner's 50% working interest in the lease.
- New Wells – *Rooster* completed the #A-1 Well at Grand Isle 70 in March, and drilled and completed three new wells at Vermilion 376 that began producing in June.

Rooster Energy, Ltd., December 31, 2012, Management Discussion and Analysis ("Rooster MDA")[attached as Exhibit I], p. 2 (emphasis added).

52. Continuing on page 3 of the Rooster MDA, Rooster falsely described the VR 376 Lease as follows:

**Vermilion Block 376** – The ***Company*** [defined as Energy Ltd] ***is the operator and owner of the operating rights in the lease covering Vermilion Block 376 and all wells thereon***, with the exception of the Vermilion 376 #A-3 and #A-4 wells, in which it owns a 70% working interest ("WI").

Rooster MDA, p. 3 (emphasis added).

53. Counter-Defendants further blurred the distinction between Rooster OG and Rooster Petroleum in the Participation Agreement itself. Specifically, in the Participation Agreement, Counter-Defendants define the term "Rooster" as being Rooster OG and Rooster Petroleum collectively [Ex. A, p. 1].

54. Further, with respect to the various oil and gas interests and operatorships, Counter-Defendant Rooster Ltd, the publicly traded company, not only represents and discloses to the general public and its investors that Rooster Ltd actually owns and operates interests, but also misrepresents that the interest it owns in VR 376 is a working interest, versus an Operating Interest. Specifically, Rooster Ltd discloses on its website the following:

> **Rooster Energy, Ltd. owns a 100% WI [working interest] in Vermilion Block 376**, a federal lease located in 300 feet of water approximately 115 miles offshore of Louisiana. **Rooster Energy, Ltd. currently serves as operator** of the field. The field currently consists of 2 dual completed wells and 3 single completed wells located on a 4 pile production platform.

Rooster Ltd. website page, http://www.roosterenergyltd.com/vermilion-376.php, a copy of which is attached as Exhibit B (emphasis added).

55. Counter-Defendants proceed in the Participation Agreement by representing and alleging that "Rooster is the owner of 50% of the Operating Rights interest in the Lease..." [Ex. A, p. 1] and that in consideration of IOG's participation in the Wells, "Rooster hereby agrees to assign to Participant an undivided twenty-five percent (25%) working interest in the wellbore of each of the [Wells]...." [Ex. A, p. 2]. Even in section 7 of the Participation Agreement, Rooster, collectively makes representations and warranties regarding Apache's and Rooster's interest in the Lease and that Apache is assigning its interest to them [Ex. A, p. 4] and that further

COUNTER-PLAINTIFFS' ORIGINAL COUNTERCLAIM AND APPLICATION FOR APPOINTMENT OF RECEIVER 14

that both Rooster OG and Rooster Petroleum "shall deliver a wellbore assignment that shall convey the Assigned Interest by special warranty by, through and under Rooster Oil & Gas, LLC...." [*Id*]. Thus, even in the last cited provision, Counter-Defendants are continuing to claim both Rooster OG and Rooster Petroleum own title to the Participation Interest, but that Rooster OG was given the authority to convey it.

56. Counter-Defendant Murphy is not only an executive of the various Counter-Defendants, but is a co-conspirator, has participated in and has benefitted from the theft of Counter-Plaintiffs' share of the Ongoing Production. In addition to helping to orchestrate and implement the scheme, Counter-Defendant Murphy has personally benefitted from the theft perpetrated on Counter-Plaintiffs through the repayment of a multi-million loan made by one of Counter-Defendant Murphy's entities to Rooster Ltd and secured by VR 376.

57. Counter-Defendant Morrison is not only an executive of the various Counter-Defendants, but is a co-conspirator, has participated in and has benefitted from the theft of Counter-Plaintiffs' share of the Ongoing Production. Counter-Defendant Morrison has personally benefitted from the theft perpetrated on Counter-Plaintiffs through the repayment of a multi-million loan made by one of Counter-Defendant Murphy's entities to Rooster Ltd and secured by VR 376.

58. Counter-Defendant Tamplain is believed to have been the chief architect of the plan, and is a co-conspirator with Counter-Defendants', to steal Counter-Plaintiffs' minerals and to violate the Keeper Order.

59. Counter-Plaintiffs have been required to retain the undersigned

attorneys to represent them in this proceeding and have agreed to pay said attorneys a reasonable fee for their services and to reimburse them for their costs incurred.

60.     All conditions precedent to Counter-Plaintiffs' right of recovery and to enforcement of the Participation Agreement, the Keeper Order and the Operating Agreement have been performed or have otherwise been excused.

### FIRST CAUSE OF ACTION
### (Theft/Conversion)

61.     Counter-Plaintiffs reassert and incorporate the allegations contained in paragraphs 1 through 59 above.

62.     Counter-Defendants' month after month of taking of Counter-Plaintiffs' minerals constitute multiple counts of criminal activity in violation of 18 U.S.C. § 659.

63.     Further, by taking, failing to pay for, and failing to account to Counter-Plaintiffs for the share of production under the Participation Agreement, Counter-Defendants have converted Counter-Plaintiffs' minerals.

64.     As a result of Counter-Defendants' theft and conversion of Counter-Plaintiffs' minerals, Counter-Plaintiffs have suffered damages in the amount of at least $3 million, as of the date of the writing of this Counterclaim, for which amount Counter-Plaintiffs now seek judgment against Counter-Defendants, jointly and severally, together with prejudgment interest thereon at the highest lawful rate, post-judgment interest at the legal rate and costs of Court.

65.     Counter-Defendants have committed the foregoing acts of theft and conversion knowingly, maliciously and with the specific intent to damage Counter-

Plaintiffs. As a result, Counter-Plaintiffs are entitled to recover punitive damages against each Counter-Plaintiff in the amount of at least $6 million apiece, for which amounts Counter-Plaintiffs now sue Counter-Defendant, together with post-judgment interest thereon at the highest lawful rate.

66. Because Counter-Defendants have violated a federal criminal statute, Counter-Plaintiffs maintain that the caps imposed under Texas law on punitive damage awards are inapplicable in this case. Counter-Plaintiff believes and so alleges that the Entity Counter-Defendants have indemnified and agreed to hold harmless Counter-Defendants Murphy, Tamplain, and Morrison as well as cross-indemnified each other such that Counter-Defendants are jointly and severally liable for all actual and punitive damages.

**THEREFORE,** Counter-Plaintiffs request that Counter-Defendants be cited to answer and appear and, that upon final hearing hereof, Counter-Plaintiffs have judgment against Counter-Defendants, jointly and severally, for actual damages in the amount of at least $3 million, together with pre-judgment interest at the fraud rate of 10% per annum thereon, punitive damages in the amount of at least $6 million per Counter-Defendant, jointly and severally for actual and punitive damages of $39 million, and post-judgment interest at the highest legal rate, costs of Court and such other and further relief, at law or in equity, to which Counter-Plaintiffs may be justly entitled.

### SECOND CAUSE OF ACTION
### (Breach of Contract)

67. Counter-Plaintiffs reassert and incorporate the allegations contained in paragraphs 1 through 66 above.

COUNTER-PLAINTIFFS' ORIGINAL COUNTERCLAIM AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                17

68. This cause of action is brought against Counter-Defendants Rooster OG, Rooster Petroleum, Rooster LLC and Rooster Ltd (hereinafter referred to as the "Entity Counter-Defendants").

69. The Entity Counter-Defendants' failure and refusal to remit full payment to Counter-Plaintiffs constitute breaches of the Participation Agreement and Operating Agreement.

70. As a result of the Entity Counter-Defendants' breaches, Counter-Plaintiffs have been damaged in the amount of at least $3 million, for which amount Counter-Plaintiffs now sue the Entity Counter-Defendants, jointly and severally.

71. Counter-Plaintiffs are further entitled to recover their reasonable and necessary attorney's fees and costs for the litigation, collection, appeal and petition for review proceedings relating to this cause of action, for which amounts Counter-Plaintiffs now sue the Entity Counter-Defendants, jointly and severally.

**THEREFORE,** Counter-Plaintiffs request that the Entity Counter-Defendants be cited to answer and appear and, that upon final hearing hereof, Counter-Plaintiffs have judgment against the Entity Counter-Defendants, jointly and severally, for actual damages in the amount of at least $3 million, together with pre-judgment interest at the highest lawful rate, post-judgment interest at legal rate, costs of Court and such other and further relief, at law or in equity, to which Counter-Plaintiffs may be justly entitled.'

### THIRD CAUSE OF ACTION
### (Suit for Accounting/Audit)

72. Counter-Plaintiffs reassert and incorporate the allegations contained in paragraphs 1 through 70 above.

73. Despite Counter-Plaintiffs' efforts, Counter-Defendants have failed to provide an accounting to Counter-Plaintiffs of the amount of minerals stolen and the dollar amount associated with the minerals stolen.

74. Counter-Plaintiffs are entitled to an accounting and the appointment of an auditor pursuant to Texas Rule of Civil Procedure 172, for the issuance of a sworn auditor's report and for the adoption by the Court of the report, for which Counter-Plaintiffs now sue Counter-Defendants.

**THEREFORE,** Counter-Plaintiffs request that Counter-Defendants be cited to answer and appear and, that the Court summarily and expeditiously appoint an auditor pursuant to Texas Rule of Civil Procedure 172, that the Court order said auditor to submit its report and provide for objections as stated under the Rule and that the Court enter a finding in this cause regarding the amount of minerals and/or monies stolen by Counter-Defendants from Counter-Plaintiffs and for such other and further relief, at law or in equity, to which Counter-Plaintiffs may be justly entitled.

### APPOINTMENT OF RECEIVER

75. Counter-Plaintiffs reassert and incorporate the allegations contained in paragraphs 1 through 74 above.

76. Counter-Defendant Rooster Ltd, although purportedly a Canadian entity, engages in business in Texas and maintains its offices, including the office of its Chief Executive Officer and President, Counter-Defendant Murphy, in Houston, Harris County, Texas. Counter-Defendant Rooster Ltd is listed as a member of Counter-Defendant Rooster LLC with the Louisiana Secretary of State with its office

listed as being located in Houston, Harris County, Texas.

77. Counter-Defendant Rooster LLC, although a Louisiana limited liability company, engages in business in Texas. Rooster LLC maintains its mailing address in Houston, Harris County, Texas. Counter-Defendant Rooster LLC further lists its manager (Counter-Defendant Murphy), member (Counter-Defendant Ltd) and general counsel and member of its management team (Counter-Defendant Tamplain) as being located in Houston, Harris County, Texas.

78. Counter-Defendant Rooster OG, a Delaware limited liability company, is authorized to conduct business in Texas and maintains its offices and executives in Houston, Harris County, Texas.

79. Counter-Defendant Rooster Petroleum, a Delaware limited liability company, is authorized to conduct business in Texas and maintains its offices and executives in Houston, Harris County, Texas.

80. Counter-Plaintiffs seek the appointment of a receiver for all the property, in and outside this state, of Counter-Defendants Rooster Ltd, Rooster LLC, Rooster Petroleum and Rooster OG pursuant to and in accordance with Texas Business Organizations Code, § 11.410 (the "Foreign Entity Receivership Statute") and in accordance with the ordinary usages of equity as circumstances exists that necessitate the appointment of a receiver by this Court.

81. Counter-Defendants have stolen Counter-Plaintiffs' minerals, have violated the Federal Court Order, have violated federal criminal statute 18 U.S.C. § 659 and have covered-up their criminal and contemptuous conduct by failing and refusing to provide Counter-Plaintiff with an accounting of the amounts stolen.