Rowan with respect to an Exploratory Well, then Rooster may cash call Participant for its proportionate share of the amounts being cash called by Rowan, and Participant hereby agrees to pay any invoice for same within fifteen (15) days of the invoice date.

"Casing Point" is defined as that point in time when an Exploratory Well has been drilled to its Objective Depth (as defined below) and appropriate tests and logs have been conducted and the recommendation is made by Rooster to plug and abandon or run and set a production string of casing and attempt a completion on such Exploratory Well. At that point, Participant will be provided verbal or written notification of such an event and recommendation and shall then have twenty-four (24) hours to elect to concur with the recommendation of Rooster or elect an alternative. If Rooster recommends attempting completion in an Exploratory Well and Participant elects to plug and abandon or otherwise fails to concur with a completion recommendation within such twenty-four (24) hour period, then Participant shall not earn or be entitled to the Assigned Interest in such Exploratory Well and thereafter shall only be responsible for its share of costs incurred in such Exploratory Well to such Casing Point election and for plugging and abandonment costs if the applicable Exploratory Well is not successfully completed; if the applicable Exploratory Well is successfully completed and Participant did not participate in such completion, then Participant shall have no liability or obligation for plugging and abandonment costs, and Rooster shall indemnify and hold Participant harmless therefrom.

3. <u>Exploratory Wells</u>. The VR 376 A-3 Well shall be drilled to a total depth of approximately 4,230' TVD/7,977' MD or such depths as will be sufficient to test the S-2 sand formation and the VR 376 A-4 Well shall be drilled to a total depth of approximately 6,200' TVD/6,967' MD or such depths as will be sufficient to test the T-3 sand formation (collectively, the *"Objective Depths"*). Rooster represents and warrants that it has obtained, or at the time of commencement of drilling of each of the Exploratory Wells will have obtained, all necessary government approval to drill to the Objective Depths.

The commencement of drilling on any well shall be that point in time when the drilling bit turns in the ground for the drilling of any well contemplated herein.

4. <u>Substitute Well</u>. If during the drilling of the Exploratory Wells or any substitute well as provided in this Section 4, mechanical difficulties, heaving shale, rock shale, excessive saltwater flow, practically impenetrable formations or other conditions occur in the hole which would cause a reasonable and prudent operator under the same or similar circumstances to discontinue drilling and to plug and abandon, or plugback and sidetrack, such well, each Party hereto shall have the right, but not the obligation, to commence actual drilling operations on another well or sidetracking operation on such well (hereinafter referred to as the *"Substitute Well"*) at a mutually agreeable location on the Lease within thirty (30) days after the date the drilling rig was released from the last operation on the Exploratory Wells. In such case, if Participant elects not to participate in a Substitute Well, it shall have no obligation for any costs, expenses or liabilities related to such Substitute Well and it shall not earn the Assigned Interest in the Substitute Well. If both Parties make an election to commence actual drilling operations for the

Substitute Well, it shall in all respects be considered as if it were one of the Exploratory Wells (as applicable).

5. <u>Operator</u>. Rooster Petroleum, LLC, is currently operator of the Lease and shall continue as Operator of the Lease in accordance with the terms and provisions of the Operating Agreement (as defined in Paragraph 6 hereinafter). Participant hereby agrees to execute appropriate documents, if necessary, designating Rooster Petroleum, LLC, to be operator of the Lease, along with the execution of any other documents required in order to drill the Exploratory Wells and produce same from the Platform.

6. <u>Operating Agreement</u>. Operations on the Lease are currently subject to an existing Offshore Operating Agreement effective October 1, 1999 between PetroQuest Energy One, L.L.C., as Operator, and LLOG Exploration & Production Company, as Non-Operators, covering all of OCS-G 14428 Vermillion Block 376 (the *"Operating Agreement"*), a true and correct copy of which is attached hereto as Exhibit "F". Rooster represents that no amendments have been made to the Operating Agreement. A Ratification of Operating Agreement will not be required, however, the Operating Agreement shall govern all operations contemplated under this Participation Agreement after Casing Point of each of the Exploratory Wells.

7. <u>Title and Assignment</u>. Rooster represents and warrants to Participant that Apache Corporation owns an undivided 50% of the operating rights in and to the Exploratory Wells and has elected not to participate in the drilling of the Exploratory Wells and hence upon commencement of operations on the first of the Exploratory Wells, all of Apache Corporation's leasehold operating rights in the Exploratory Wells and title to production therefrom shall be owned and vested in Rooster for as long as the operations on the Exploratory Wells are being conducted or production is obtained subject to the terms of the Operating Agreement. Rooster represents and warrants to Participant that, in addition to the Apache interest, Rooster owns an undivided fifty percent (50%) of the operating rights in and to the Exploratory Wells and the production therefrom. Conditioned on its performance in accordance with the terms hereof, Participant shall be the owner of an undivided twenty five percent (25%) of the operating rights in and to the Exploratory Wells subject to the terms of the Operating Agreement. Upon completion of each Exploratory Well, Rooster shall tender and Participant shall take an assignment of the Assigned Interests in the wellbore of such Exploratory Well as limited by the terms of the Operating Agreement and in particular the provisions of Article 12 thereof. Rooster shall deliver a wellbore assignment that shall convey the Assigned Interest by special warranty by, through and under Rooster Oil & Gas, LLC, but not otherwise, and shall be limited as to warranties in such manner as shall be set forth in the instrument of assignment covering the Assigned Interest (the *"Wellbore Assignment"*) subject only to the burdens, agreements and other items set forth in Exhibit "A" attached hereto and made a part hereof (the *"Permitted Encumbrances"*). A separate Wellbore Assignment shall be made for each of the Exploratory Wells. Each Wellbore Assignment will be filed by Rooster in the appropriate public records of the appropriate parish(es) of Louisiana and the records of the Bureau of Ocean Energy Management, Department of the Interior (*"BOEM"*) and they shall be substantially similar to the forms attached hereto and made a part hereof as Exhibit "C-1" and Exhibit "C-2". Each Wellbore Assignment shall be

effective as of the Effective Date. The net revenue interest attributable to the Assigned Interest is 18.166599% before Payout and 17.58333% after Payout (based upon the net revenue interest attributable to the 6/6ths working interest in the Lease being 72.66636% before Payout as limited in depth (as set out in Exhibit "A" attached hereto) in the wellbore of each of the Exploratory Wells. At 7:00 a.m. upon the day following the date of recoupment of the non-consent penalties provided for in the Operating Agreement which may or may not happen prior to Payout, Apache Corporation shall be vested with 100% of the Assigned Interest and shall become a Participating Party in the operations for the Exploratory Wells. At that date, Participant shall not own or be vested with any other rights in the Assigned Interests.

"Payout" is defined in that certain Farmout Agreement effective December 15, 1998, between BHP Billiton Petroleum (Deepwater) Inc. et al, as Farmor, and PetroQuest Energy One, L.L.C., as Farmee.

Notwithstanding anything to the contrary therein, Rooster represents and warrants to Participant that the Assigned Interest to be conveyed to Participant is no less than the working interest and the attributable net revenue interest set out hereinabove in this Section 6 and is burdened as described in the Permitted Encumbrances in Exhibit "A" attached hereto. The representations and warranties herein shall survive for the entirety of the period wherein Participant owns or is vested with any of the rights in the Assigned Interests, and for as long thereafter as necessary to protect Participant against any claim, demand, or suit related to the existence of the burdens attributable to the Assigned Interests as listed on Exhibit "A" attached hereto.

7. <u>Use of the Platform</u>. The costs necessary to connect any of the Exploratory Wells to the facilities on the Platform and any modification to the Platform as a result of production from the Exploratory Wells shall be shared and paid proportionately by Rooster, the Participant and the other working interest owners, if any, of the Exploratory Wells. Platform operating and maintenance expenses shall be allocated in proportion to the producing well count during a calendar month as it relates to the total number of wells producing from the Platform during such calendar month. For purposes of this provision, a producing zone or each completion in a multi-completed well shall be considered as a separate well. If a separate Production Use Agreement is necessary, Participant agrees to execute an agreement reflecting the terms set forth in this paragraph.

The Parties hereby agree that there shall be as a slot fee of $150,000.00 (6/6ths basis) for each of the Exploratory Wells, or a total of $300,000 to be paid to the joint account owners of the Platform. Rooster represents and warrants to Participant that no other slot fee or payment in regard to the use of a slot on the platform will be required by Participant in excess of $150,000.00 for each of the Exploratory Wells, reduced proportionally to Participant's Assigned Interest, with any additional amounts required by Apache being payable by Rooster. The Parties also hereby agree that Participant will not be assigned nor have any ownership in the existing wells, equipment or facilities, including, but not limited to the Platform, currently on the Lease, and specifically Participant will not be liable to pay any plugging and abandonment or decommissioning

liability, except that it shall be responsible for and pay its proportionate share of any plugging and abandonment liability for the Exploratory Wells if necessary and if an Exploratory Well is plugged and abandoned prior to any interest therein reverting to Apache pursuant to the Operating Agreement.

8. <u>Assumption</u>. Participant agrees that the Assigned Interest shall be subject to the terms of the Operating Agreement and the Permitted Encumbrances, and hereby assumes and agrees to pay and fully perform all costs, obligations and liabilities arising from and after the Effective Date of this Participation Agreement in respect of the Assigned Interest attributable to the Exploratory Wells as set out in the AFE made prior to the Effective Date of this Participation Agreement; provided that Participant shall have an election at Casing Point of each Exploratory Well to decline to participate in the completion of such Exploratory Well and if it elects or is deemed to elect not to participate in the completion, Participant shall have no obligation for costs, liabilities and expenses incurred after Casing Point with respect to such Exploratory Well.

9. <u>Insurance</u>. Rooster Petroleum, LLC, as Operator (such term being defined in the Operating Agreement), hereby agrees to carry and maintain for all operations contemplated hereunder at least the insurance provided for in the Operating Agreement and will also purchase insurance to cover the Assigned Interest, unless prior to commencement of operations for the Exploratory Wells Participant elects to carry its own insurance and so notifies Rooster by sending a Certificate of Insurance to evidence its coverage.

10. <u>Furnishing Information</u>. Participant and its representatives shall at all times have access, at their sole risk, to the Platform from which the Exploratory Wells are drilled and to all information and samples acquired in connection with the drilling, testing and completion of each Exploratory Well. Said access shall be at Participant's sole risk, liability and expense, and Participant will be required to notify Rooster prior to accessing the Platform and Participant shall comply with Rooster's safety and environmental policies during such occurrences. As concerns drilling and completion operations on each of the Exploratory Wells, Rooster shall promptly deliver to Participant all information and data related to each of the Exploratory Wells, including, without limitation, (i) daily drilling reports by fax or email, and (ii) all information set forth in Exhibit "D", attached hereto and made a part hereof.

11. <u>Audit Rights</u>. Participant and its duly authorized representatives shall have access to audit Rooster's records relating to the Exploratory Wells during reasonable business hours and as may be otherwise provided for by the Operating Agreement.

12. <u>Liability of Parties</u>. Notwithstanding any provisions hereof, the liabilities of the Parties are several, not joint or collective, and each Party shall be responsible only for its share of the costs and liabilities incurred as provided herein. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership or association (except as provided to the limited extent for tax purposes in Section 13), or to render the Parties liable as partners.

13. <u>Costs of Non-Consent Operation</u>. Rooster agrees that all of the costs of a type set forth on Schedule 13 to this Agreement will be included in the itemized statement that Rooster will give under Section 12.1.5 of the Operating Agreement with respect to each Exploratory Well.

14. <u>Governing Law</u>. This Participation Agreement and all instruments executed in accordance with it, and the rights and obligations of the parties hereto shall be governed, construed, and enforced in accordance with the laws of the State of Texas, without regard to rules governing conflict of laws. Venue for any litigation concerning or related to this Participation Agreement shall be in any state or federal court with jurisdiction located in Harris County, Texas.

    If this Participation Agreement is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same by either Party for any reason, or sums due hereunder are collected through bankruptcy or probate proceedings, then Rooster and Participant each agree that there shall be added to the amount due and owing to the prevailing Party in any dispute or litigation all reasonable attorneys' fees and costs incurred in connection with collection and/or litigation.

15. <u>Confidentiality and Press Releases</u>. Participant shall consult with Rooster with regard to all publicity and other releases it may issue concerning this Participation Agreement and the transactions contemplated hereby and, except as required by applicable law or the applicable rules or regulations of any governmental body or stock exchange, Participant shall not issue any public statement or other release concerning or related to the Exploratory Wells without the prior written consent of Rooster.

16. <u>Severability</u>. All provisions herein are severable and in the event any one of them shall be held invalid by any court of competent jurisdiction, this Participation Agreement shall be interpreted as if such invalid provision was not contained herein.

17. <u>Captions</u>. The captions in this Participation Agreement are for convenience of reference only and shall not limit or otherwise affect the construction or interpretation of any provision of this Participation Agreement.

18. <u>Conflict</u>. If there is any conflict between the terms and provisions of this Participation Agreement and the terms and provisions of the Operating Agreement, the terms of this Participation Agreement shall control.

19. <u>Survival</u>. This Participation Agreement and the representations, warranties, covenants and agreements contained herein shall survive the consummation of the transactions contemplated herein.

20. <u>Further Assurances</u>. From and after the date hereof, each of the Parties hereto, without further consideration, shall use its best efforts to execute, deliver and record, or cause to be executed, delivered, and recorded, good and sufficient instruments of conveyance and transfer, and take such other action as may be reasonably required to carry out the purpose of this Participation Agreement. Failure of any Party to execute and return any